CASCADIA WILDLANDS PROJECT, Oregon Natural Resources Council Fund, Center for Biological Diversity and Willamette Riverkeeper, Plaintiffs,

v.

U.S. FISH & WILDLIFE SERVICE, Defendant.

No. CV 02–747–RE.

United States District Court, D. Oregon.

Aug. 7, 2002.

Christopher G. Winter, Ralph O. Bloemers, Cascade Resources Advocacy Group, Portland, OR, for Plaintiffs.

Michael W. Mosman, United States Attorney, Jeffrey Handy, Assistant United States Attorney, Portland, OR, Thomas L. Sansonetti, Assistant Attorney General, Jean E. Williams, Section Chief, S. Jay Govindan, Trial Attorney, U.S. Department of Justice, Environment and Natural Resources Division, Wildlife and Marine Resources Section, Washington, DC, for Defendant.

## OPINION AND ORDER

REDDEN, District Judge.

The matter before the court is plaintiffs' motion (doc. 4) for a temporary restraining order and preliminary injunction pending a final adjudication on the merits of its action to invalidate a Biological Opinion ("BiOp2002") issued on May 7, 2002, by defendant U.S. Fish and Wildlife Service ("FWS") to the United States Forest Service ("Forest Service") regarding the impact on the bull trout of four timber sales in the Willamette National Forest. The four timber sales are called Staley, Upper Liz, Tumbler, and Happy Bird. Based upon the representations of counsel for the parties that there will be no further activity on the Tumbler and Happy Bird sales until at least 2003, this opinion and order shall apply only to the Staley and Upper Liz timber sales.

### *BACKGROUND*

#### A. *Status of Bull Trout.*

The bull trout was listed as a threatened species pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1533, and 50 C.F.R. Part 402 in June 1998. The bull trout used to be prevalent from as far north as Alaska and as far south as Northern California. BiOp2002 at p. 6. By 1997, however, it was apparently extirpated in the Upper Middle Fork Willamette Watershed of the Willamette National Forest,

the site of the timber sales. The last photograph of a bull trout in that region was in 1990. *Id.* at p. 12. Major reasons for the decline of the bull trout include the accumulation of fine sediments in the gravel where bull trout spawn and incubate their eggs and fry, which (1) substantially reduces their survival rate because the "preferred spawning habitat includes low gradient streams with loose, clean gravels"; and (2) reduces and/or alters the water flow, thereby impeding the early development of the embryos and fish, creating smaller fry, which in turn impedes the ability of the fish to survive. *Id.* at pp. 8—10.

The construction, reconstruction and use of permanent and temporary unpaved and/or unfinished roads as a result of timber operations are a significant source of the fine sediments that adversely affect native fish communities such as the bull trout. *BiOp2002* at pp. 8–9, 15. There is a direct historical correlation to bull trout populations related to road densities. Bull trout were "*absent* at a mean road density of 1.71 miles/mile, *depressed* at 1.36, and *strong* at 0.45 miles/mile." *Id.* at p. 9 (emphasis in original).

High quality bull trout spawning and rearing habitats exist in the Middle Fork Willamette, and in 1997, the Oregon Department of Fish and Wildlife began a program that has had some success in reintroducing bull trout fry in the Middle Fork Willamette Basin. *Id.* at p. 12. Fry have been reintroduced at various locations, all of which are at least five miles from the closest of the timber sale areas (Staley). *Id.* at p. 21. Reintroduced bull trout have been seen, however, as far as 12 miles downstream from their reintroduction location. *Id.* at p. 13. Any spawning of bull trout this fall will likely be from the survivors of the first fry introduced in 1997. *Id.* at p. 21.

## B. *The Timber Sales.*

### 1. *Staley.*

The Staley sale consists of 191 acres in the Staley 6th Field of the Upper Middle Fork Willamette Watershed. The harvested timber will be hauled along Staley Creek, the lower reaches of which are potential bull trout habitat. The haul route is 47.9 miles long, of which 24.1 miles are unpaved roads. The route crosses seven perennial fish bearing streams, including Staley Creek twice. There is no new road construction, but there will be 21.1 miles of moderate-level and 2.0 miles of low-level road reconstruction associated with the sale. BiOp2002 at pp. 5–6. Potential road reconstruction will occur adjacent to potential bull trout habitat in Staley Creek. *Id.* at p. 16. Road density in Staley Creek is already at 3.2 miles/mile, "well-above the 2.4 mi/mi that is considered 'functioning at unacceptable risk' for bull trout." BiOp2002 at p. 16.

### 2. *Upper Liz.*

The Upper Liz sale consists of 307 acres in the Staley 6th Field of the Upper Middle Fork Willamette Watershed. The harvested timber will be hauled along approximately five miles of gravel-surfaced roads at high elevations, crossing 4 non-fish bearing streams. There will be 2.6 miles of temporary road construction. The temporary roads will be hydrologically closed within one year of timber harvest. There will be 5.1 miles of road reconstruction associated with the sale. BiOp2002 at p. 5.

## C. *ESA Consultation Process.*

The bull trout is listed as a threatened species under the ESA. As a result, the Forest Service is required to insure that the four timber sales are "not likely to jeopardize the continued existence" of the bull trout. 16 U.S.C. § 1536(a)(2). Because the timber sales may affect the bull

trout, the Forest Service must consult with the FWS to assess whether there is a likelihood that the timber sales will jeopardize the bull trout and result in adverse modification of critical habitat. 16 U.S.C. §§ 1536(a)(3) and (4); 50 C.F.R. §§ 402.14(a) and (c). If the FWS, following consultation with the Forest Service, finds that the bull trout is not jeopardized, but that an incidental take of bull trout is likely to or will occur, it may issue an "Incidental Take Statement" specifying: (1) the impact of the take on the bull trout; (2) reasonable and prudent measures necessary to minimize the impact; (3) terms and conditions that the Forest Service must comply with in implementing the sales; and (4) the method of handling and disposing of taken fish. 50 C.F.R. § 402.14(i). If the FWS issues an Incidental Take Statement, and the Forest Service actions result in a take of bull trout, the Forest Service is exempt from civil or criminal sanctions arising from the take as long as it has fully complied with the terms and conditions set forth in the Incidental Take Statement. 16 U.S.C. § 1536(o).

The FWS has issued three Biological Opinions that impact the Staley and Upper Liz timber sales. The first Biological Opinion ("BiOp1999") was issued in 1999. It was site-specific to the four timber sales at issue here (as well as one other sale, Simco, which was subsequently withdrawn). The second Biological Opinion ("ProBiOp2000") addressed the impact of the implementation of the 1994 Northwest Forest Plan ("Forest Plan") on the bull trout. The consummation of the consultation process occurred with the issuance of BiOp2002 by the FWS to the Forest Service.

### 1. *BiOp1999.*

BiOp1999 and BiOp 2002 relate substantially the same history of the bull trout and cumulative impacts of past practices. Both BiOps conclude that the sales will not jeopardize the bull trout. BiOp1999, however, concludes that there likely would be an incidental take of bull trout resulting "primarily from short-term detrimental effects on suspended sediment levels, substrate quality, water temperature, bank stability, and food supply, all of which directly or indirectly affect the life history of this species." BiOp1999 at p. 14. For purposes of this opinion, the most significant changes from BiOp1999 and BiOp2002 are: (a) the roads to be constructed for the Upper Liz sale were to be permanent in BiOp1999, whereas they will now be hydrologically closed within one year of the timber harvest; (b) there may be fewer culverts associated with the Upper Liz road construction and they may be plugged or removed when the roads are closed; and (c) the haul routes for Staley and Upper Liz have been changed. BiOp2002 at pp. 3–4.

### 2. *ProBiOp2000.*

In 2000, the FWS issued a programmatic biological opinion that addressed the impact of the implementation of the Forest Plan on the bull trout. The FWS concluded that there would be no jeopardy to the bull trout from timber projects where the standards and guidelines of the Aquatic Conservation Strategy ("ACS"), as set forth in the Northwest Forest Plan, are implemented. ProBiOp2000 at p. 82. The FWS concluded that there would likely be incidental take of bull trout from the Forest Service actions that are consistent with the Forest Plan. One of the terms and conditions imposed for "Timber Management Actions" was that the Forest Service would "[a]nalyze, design and implement timber harvest activities to meet ... ACS objectives." *Id.* at pp. 86, 89. Among the assumptions that the FWS made regarding agency actions, including those of the Forest Service, was that "[a]ll actions in watersheds containing bull trout shall be

consistent with the appropriate ACS objectives of the [Forest Plan]." *Id.* at p. 48. The FWS directed the Forest Service to manage riparian-dependent resources "to maintain the existing condition or implement actions to restore conditions." *Id.* at p. 49. The FWS further directed that "some form of analysis to determine project consistency with the nine ACS objectives is necessary in all watersheds ..." *Id.* p. 50.

### 3. *BiOp2002.*

In BiOp2002, the FWS concluded that there would be no take of bull trout from any of the four timber sales addressed in the opinion, including Staley and Upper Liz. There is no discussion or analysis of consistency with ACS objectives. The FWS concluded that timber harvesting itself would not affect the bull trout. Road construction and reconstruction, and the use of the roads to haul the harvested timber, would be most likely to have an impact, if there were any at all, on the bull trout. BiOp2002 at pp. 15–16. The FWS concluded that "road reconstruction, while improving road drainage and reducing sources of sediment and erosion in the long term, is likely to have a **short-term DEGRADE** with a **long-term RESTORE** effect to the 6th field watersheds where it occurs." *Id.* at p. 16 (emphasis in original). Related findings made by the FWS in BiOp2002 include the following:

**Sediment:** Embeddedness occurs in stream reaches of [the] 5th Field ...

Based on these observations the environmental baseline rates as **FUNCTIONING AT RISK.** Fine sediment from the road system may have been transported downstream into the Middle Fork Willamette where it is likely to end up within areas used by bull trout.

.    .    .    .    .

**Disturbance History:** ... Because of the private land harvest methods, previous Forest Service riparian harvest, roads on unstable slopes, and lack of regeneration in certain areas, the baseline is **FUNCTIONING AT UNACCEPTABLE RISK.**

Other indicators considered **AT RISK** include *habitat access, off-channel habitat, channel width depth ratio, streambank condition,* and *floodplain connectivity.* Additional indicators in the BA [Biological Assessment] considered **FUNCTIONING AT UNACCEPTABLE RISK** include *pool frequency and quality, change in peak/base flows, increase in drainage network/road density, riparian reserves, disturbance regime,* and *integration of species and habitat conditions.*

BiOp2002 at pp. 14–15 (emphasis in original).

Notwithstanding these findings, and without any analysis of ACS objectives relative to the findings, the FWS concluded that there would be no take of bull trout from the timber sales, and therefore no Incidental Take Statement, with accompanying terms and conditions, was necessary.

### ISSUES

Plaintiffs contend that BiOp2002 should be invalidated because (1) the FWS failed to insure that the timber sales will comply with the ACS objectives contained in the Forest Plan; (2) the FWS failed to use best available scientific evidence in determining impacts to bull trout; and (3) the FWS failed to analyze cumulative impacts from timber-related activities on private land within the same watershed.

The FWS contends that (a) the court lacks subject matter jurisdiction because BiOp2002 is not a final agency action; and (b) the FWS opinion that the timber sales will not result in any take of or harm to bull trout is reasonable and entitled to

deference by the court. In essence, the latter contention of the FWS is that no bull trout are found or are likely to be found in the areas potentially affected by the timber sales.

### STANDARDS OF REVIEW

#### A. Final Agency Actions Under ESA.

█ Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *Arizona Cattle Growers' v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1235 (9th Cir. 2001). The reviewing court must determine that the agency decisions are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. To determine whether an agency violated the arbitrary and capricious standard, the court must determine whether the agency articulated a rational connection between the facts found and the choice made. The court is not empowered to substitute its judgment for that of the agency. As long as the agency decision was based on the relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious. *Id*, at 1236; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

#### B. Injunctive Relief Under ESA.

█ Generally, in order to obtain a preliminary injunction, a party must demonstrate either (1) a likelihood of success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions on the merits and a balance of hardships tipping in its favor. *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992). In considering injunctions under the ESA, however, the Ninth Circuit holds that the balance of hardships and the public interest tip heavily in favor

of endangered species. *Friends of the Earth v. United States Navy*, 841 F.2d 927, 933 (9th Cir.1988).

### DISCUSSION

The facts and legal issues in this case are substantially similar to those addressed by the Ninth Circuit in *Pacific Coast Federation of Fishermen's Associations, Inc. v. National Marine Fisheries Service*, 265 F.3d 1028 (9th Cir.2001) ("*PCFFA*"). In *PCFFA*, the plaintiffs initially sought injunctive relief, followed by summary judgment, to vacate biological opinions stating that 23 timber sales in the Umpqua River Basin in Western Oregon were not likely to jeopardize the Umpqua cutthroat trout and Oregon Coast coho salmon. As here, the plaintiffs contended that the biological opinions were inconsistent with ACS objectives, failed to consider adequately short-term impacts of the timber sales, and failed to consider adequately the best available scientific evidence in rendering the no jeopardy opinions. As here, the defendant contended that the biological opinions did not constitute a final agency action, and the court therefore lacked subject matter jurisdiction to review the opinions. The Ninth Circuit affirmed the lower court's rulings that the biological opinions did constitute final agency action, thereby allowing judicial review, and that the defendant acted arbitrarily and capriciously in reaching its "no jeopardy" opinions. Plaintiffs rely heavily on the holdings in *PCFFA* to support their claims. The FWS contends that *PCFFA* has "little, if anything, to do with the issues before the Court on this motion" and that plaintiffs' reliance is misplaced. Def. Memo. at p. 2. I disagree with the FWS.

#### A. Jurisdiction.

█ The FWS contends that BiOp2002 is not a final agency decision and

is therefore not subject to judicial review. Only final agency decisions are subject to review under the APA. *PCFFA,* 265 F.3d at 1033 (citing *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 732, 118 S.Ct. 1665, 140 L.Ed.2d 921, (1998)). A two-part test is applied to determine whether an agency action is final. "(1) [T]he action should mark the consummation of the agency's decision making process; and (2) the action should be one by which rights or obligations have been determined or from which legal consequences flow." *Ecology Center, Inc. v. United States Forest Service,* 192 F.3d 922, 925 (9th Cir.1999); *PCFFA,* 265 F.3d at 1033. In *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the Supreme Court held that a jeopardy opinion was a final agency action because it effectively stopped further proceedings by the action agency. As such, the opinion has "direct and appreciable legal consequences."

In *PCFFA,* the defendant sought to distinguish *Bennett* because the biological opinions at issue were "no jeopardy" opinions, unlike the "jeopardy opinion" involved in *Bennett.* The district court and the Ninth Circuit rejected the distinction and held that a "no jeopardy" opinion was a final agency action because it met both tests: (1) it marked the end of the consultation process; and (2) it had direct and appreciable legal consequences in that, "[as] a practical matter the opinion and its accompanying Incidental Take Statement grant immunity to the proposed actions of other agencies . . . ." *PCFFA* at 1034.

▮ Here, the FWS seeks to distinguish *Bennett* and *PCFFA* on the ground that BiOp2002 did not authorize a take, and therefore did not have any legal consequences to the Forest Service. Accordingly, "[i]t carries with it no legal effect." Def. Memo. at p. 23. I disagree. Whereas an Incidental Take Statement carries with it the assurance of immunity if a bull

trout is taken, the absence of an Incidental Take Statement raises the potential of liability if a bull trout is taken. The FWS points out that the Forest Service "may proceed at its peril" and risk liability under Section 9 of the ESA, 16 U.S.C. § 1538, if there is a take. Def. Memo. at p. 23. That is a legal consequence. Even if that were not a legal consequence, the FWS further points out that its opinion of no jeopardy "maybe persuasive factual support regarding the propriety of the action agency's decision" if there is an unanticipated take which results in a claim against the Forest Service. Def. Memo. at p. 26. The ability of the Forest Service to use the "no jeopardy" conclusion in BiOp2002 in defense of its actions in a future proceeding is an appreciable legal consequence.

I conclude that BiOp2002 is a final agency action and is subject to judicial review under the APA.

### B. *Compliance with ACS Objectives.*

Plaintiffs contend that the FWS must insure that the timber sales comply with ACS objectives. Because BiOp2002 does not include any analysis of the timbers sales relative to ACS objectives, its conclusions are arbitrary and capricious. The FWS counters that the action agency, in this case the Forest Service, and not the FWS, is responsible for insuring that its actions comply with ACS objectives.

ACS objectives are set forth in the 1994 Forest Plan. In *PCFFA,* the Court summarized the ACS:

> There are four components to the ACS: (1) key watersheds (the best aquatic habitat, or hydrologically important areas), (2) riparian reserves (buffer zones along streams, lakes, wetlands and mudslide risks), (3) watershed analysis (to document existing and desired watershed conditions), and (4) watershed res-

toration (a long-term program to restore aquatic eco-systems and watershed health). The ACS also has binding standards and guidelines that restrict certain activities within areas designated as riparian reserves or key watersheds. Additionally, ACS has nine objectives designed to maintain or restore properly functioning aquatic habitats.

*PCFFA* at 1032.

In *PCFFA,* the Court agreed that it was not the role of the defendant pursuant to its obligations under the ESA to determine ACS consistency. Where the defendant equated ACS consistency with a "no jeopardy" finding, however, the defendant chose to inquire into that consistency. *Id,* at 1035. Having undertaken that inquiry, the defendant failed to analyze the short-term effects of the timber sales. The Court upheld the district court's finding that it was arbitrary and capricious for the defendant not to consider ACS objectives under those circumstances. *PCFFA* at 1036–37.

■ Here, a specific term and condition imposed on the Forest Service by the FWS in its programmatic biological opinion regarding the bull trout, ProBiOp 2000, is that the Forest Service analyze, design and implement timber harvest activities to meet ACS objectives. One of those conditions expressly incorporated by the FWS in ProBiOp2000 is that there should be no action that retards or prevents attainment of ACS objectives. BioOp2000 at p. 50. The FWS further directed the Forest Service to maintain the existing condition or implement actions to restore conditions to the watershed. In light of these conditions, upon which the FWS, in part, bases its "no jeopardy" opinion, it is appropriate to review whether the "no jeopardy" opinion is consistent with ACS objectives.

■ The FWS concludes that there will be a short-term degrade of the watershed because of fine sediment created by road reconstruction arising from the timber sales, particularly the Staley sale. Other than a conclusion that in the long-term there may be some restorative benefit from the reconstruction, there is no analysis of the extent of the short-term degradation in the context of ACS objectives. The FWS also acknowledges that road density in the watershed already exceeds the level considered to be functioning at unacceptable risk for bull trout. The timber sales will increase that road density, at least in the short term. There is, however, no analysis of the consequences arising from the increase in road density in the context of ACS objectives.

Notwithstanding its failure to consider ACS objectives, the FWS contends that its "no jeopardy" opinion was reasonable for one "simple" reason: "[T]here are no bull trout (or suitable bull trout habitat) in the vicinity of the proposed harvest and road building activities." Def. Memo. at p. 19. In BiOp2002, however, the FWS acknowledges that, although bull trout were reintroduced in the Middle Fork Willamette Basin at least five miles from the vicinity of the closest timber sale (Staley), bull trout have been seen at least twelve miles down-river from reintroduction sites. Moreover, contrary to its assertion in its memorandum, in BiOp2002 the FWS stated that road reconstruction would occur in areas adjacent to potential bull trout habitat in Staley Creek. Finally, the FWS acknowledges that timber will be hauled from the Staley sale across Staley Creek. Since the construction, reconstruction, and use of roads associated with timber sales have been identified as major causes of the decline of bull trout, historically, it seems incongruous for the FWS to conclude that those activities, occurring as they will in the vicinity of potential bull trout habitat, will have no likelihood of causing harm to the bull trout.

I conclude that there are serious questions on the merits as to whether the FWS acted arbitrarily and capriciously in failing to analyze the specific timber sales to determine whether they are consistent with ACS objectives. I conclude that there is a substantial issue whether the FWS, in carrying out its responsibilities of consultation with regard to specific projects which might jeopardize the bull trout, may ignore the specific terms and conditions it has previously deemed necessary to impose on the Forest Service to protect that endangered species.

I also conclude that there is a substantial issue whether the FWS considered all relevant factors and articulated a rational connection between its findings regarding the location of bull trout and proximity of bull trout habitat to the sites of the timber sales, and its conclusion that bull trout and bull trout habitat are not in the vicinity of any of the timber sale sites.

Based on these conclusions, and the Ninth Circuit's admonition that when considering ESA cases the balance of hardships and the public interest should tip heavily in favor of the bull trout, I conclude that a temporary restraining order and preliminary injunction are appropriate pending final resolution of this case on summary judgment where a full record of the consultations and the FWS opinions will be available for review.

In light of the above, it is not necessary for me to consider the remaining issues raised by plaintiffs regarding the consideration of the best available scientific evidence and the cumulative impacts of timber-related activities on private land. Those matters are more properly addressed on summary judgment when a complete administrative record is available for review.

## CONCLUSION

For the reasons discussed above, plaintiffs' motion (doc. 4) for a temporary restraining order and preliminary injunction is GRANTED.

IT IS SO ORDERED.