**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, et al., Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE, et al., Defendants,**

and

**American Forest Resource Council, an Oregon nonprofit corporation, et al., Defendant–Intervenors.**

No. C04–1299RSM.

United States District Court, W.D. Washington, at Seattle.

March 30, 2007.

Patti A. Goldman, Earthjustice Legal Defense Fund, Seattle, WA, for Plaintiffs.

Jean E. Williams, Wells D. Burgess, U.S. Department of Justice, Washington, DC, for Defendants.

Scott W. Horngren, Haglund Kirtley Kelley & Horngren, Portland, OR, for Defendant–Intervenors.

ORDER ADOPTING IN PART, AND DECLINING TO ADOPT IN PART, THE REPORT AND RECOMMENDATION

MARTINEZ, District Judge.

This matter is now before the Court for consideration of the Report and Recommendation filed by the Honorable Mary Alice Theiler, United States Magistrate Judge, on March 28, 2006. Dkt. # 86. The Court has reviewed the Report and Recommendation, the parties' objections and responses, and the balance of the file, and now finds and rules as follows:

(1) The thorough and well—reasoned Report and Recommendation is approved and adopted, **except** as to the conclusions in section F.1, regarding plaintiffs' challenge under the National Environmental Policy Act ("NEPA"), and all of section F.2, in which the Magistrate Judge concluded that the Final Supplemental Environmental Impact Statement ("FSEIS") did not fail to disclose dissenting opinions. For the reasons set forth in paragraph (2) below, the Court finds that the FSEIS failed to meet NEPA standards for assessing significant aquatic habitat impacts, and for the disclosure of dissenting scientists' views.

(2) **NEPA Challenges to FSEIS**

(a) *Standard of Review*

The National Environmental Policy Act imposes procedural, rather than substantive, requirements. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Pursuant to NEPA, federal agencies must prepare an environmental impact statement ("EIS") for "major Federal action [ ] significantly affecting the environment." 42 U.S.C. § 4332(2)(c). The Court reviews an agency's compliance with NEPA under the Administrative Procedure Act ("APA"). *Id.* The Court applies a "rule of reason" standard to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Center for Biological Diversity v. USFS,*

349 F.3d 1157, 1166 (9th Cir.2003) (internal citations omitted). This standard is essentially applied in the same manner as the arbitrary and capricious standard. *Id.* Judicial review consists of ensuring that an agency has taken a "hard look" at the environmental effects of the proposed action. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992).

NEPA has two stated objectives. "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (internal citations omitted). In considering a NEPA challenge, the court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Laguna Greenbelt, Inc., v. U.S. Department of Transportation,* 42 F.3d 517, 523 (9th Cir.1994) (*quoting Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.1987)). Under the "rule of reason," the court determines "' whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' by making 'a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decisionmaking and informed public participation.' " *Id., quoting Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). In interpreting NEPA, the court gives substantial deference to the regulations issued by the Council on Environmental Quality ("CEQ"), and both NEPA and the regulations are to be strictly interpreted. *Center for Biological Diversity,* 349 F.3d at 1166.

"Grudging, *pro forma,* compliance will not do." *California v. Block,* 690 F.2d 753, 769 (9th Cir.1982).

Because amendment to the Aquatic Conservation Strategy ("ACS") is a "federal action significantly affecting the environment," the Forest Service (FS) and Bureau of Land Management (BLM) were required to comply with NEPA and to prepare an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C). The agencies released their FSEIS in October 2003. As in the 1994 FSEIS, the 2003 FSEIS contained viewpoints of a collection of respected scientists who were part of the government's Forest Ecosystem Management Assessment Team ("FEMAT").

Plaintiffs' complaint alleges NEPA violations under three categories: (1) the FSEIS failed to assess the significant aquatic habitat impacts of the amendment; (2) the FSEIS failed to disclose and discuss dissenting views of respected scientists; and (3) the FSEIS failed to provide a candid, objective assessment of reasonable alternatives. The Court shall address arguments (1) and (2), which correspond to sections F.1 and F.2 in the Report and Recommendation. The Court adopts without alteration section F.3 of the Report and Recommendation, addressing argument (3), the assessment of reasonable alternatives.

*(b) Assessment of Significant Aquatic Habitat Impact*

The Court fully adopts, without restating, the discussion set forth in the Report and Recommendation at pages 29 to 34, line 16, regarding the NEPA requirement that an EIS must disclose any indirect effects, and consider "every significant aspect of the environmental impact of a proposed action. . . ." *Kern v. Bureau of Land Management,* 284 F.3d 1062, 1066 (9th

Cir.2002). In concluding that section, the Magistrate Judge noted that the federal defendants' "blithe assertion that the amendments to the ACS impose no fundamental changes is troublesome." Nevertheless, she concluded,

> it is not clear to the undersigned in what respects the 1994 FSEIS did not adequately address impacts, cumulative or otherwise, on the programmatic level even in light of the amendments to the ACS. Nor is it clear that subsequent site-specific consultations will not adequately assess such impacts. Without such a showing, it cannot be said that the 2003 FSEIS arbitrarily and capriciously tiered to the extensive assessment in the 1994 FSEIS.

Report and Recommendation, p. 35. Plaintiffs' objections have persuaded the Court that this conclusion must be revised.

The 2003 FSEIS states, with respect to the environmental consequences of the proposed ACS amendment,

> The proposed amendment has the potential to affect agency success implementing the timber sale program envisioned under the Northwest Forest Plan. Timber sales are needed to achieve the socio-economic and ecosystem management goals of the Northwest Forest Plan. The degree to which current PSQs[1] may be attained is the primary indicator for agency success in this regard.
>
> As discussed under Affected Environment, the agencies have not been able to achieve the level of timber sales predicted for the Northwest Forest Plan. The Northwest Forest Plan assumed that 90 percent of the early decades PSQ would come from late-successional and old-growth forest, much of it through regeneration harvest. However, given the court interpretations of the ACS in the *PCFFA* litigation, the PSQ cannot be sustained, because few timber sales can be designed to avoid all disturbance to aquatic and/or riparian components.
>
> **For instance, timber harvest removes canopy and exposes some land to accelerated erosion. Road work associated with the timber sales may result in short-term sedimentation.** In the *PCFFF* litigation, the court considered these types of effects incompatible with achieving ACS objectives.

2003 FSEIS, pp. 49–50 (emphasis added).

With these two sentences, the FSEIS describes the habitat-degrading effects of the activities that were not allowed under the previous ACS, but could go forward under the amended ACS. Both FEMAT and the NFP contemplate that projects must be consistent with ACS objectives. Previously, to meet ACS objectives, the Forest Service needed to ensure that road densities and the total amount of a watershed in clearcut condition would not alter runoff and erosion patterns to the detriment of water quality and fish survival. Because the ACS amendment eliminates this requirement, the impacts of that change must be fully assessed. As stated recently by this Court, where an agency has previously made a policy choice to conform to a particular standard, and now seeks to amend that standard, "the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now." *Northwest Ecosystem Alliance v. Rey*, 380 F.Supp.2d 1175, 1192 (W.D.Wash.2005). Under this reasoning, the 2003 FSEIS as-

---

1. Probable Sale Quantity, an estimate of annual timber sale levels likely to be achieved.

2003 FSEIS, p. 41.

sessment of the impact of the ACS amendment is inadequate and fails to conform to NEPA standards.

### (c) Disclosure of Dissenting Views

Regulations governing the adequacy of an EIS require that opposing scientific views be disclosed and discussed at appropriate points. The relevant regulation specify that in a draft EIS, the agency "shall make every effort to disclose and discuss at appropriate points ... all major points of view on the environmental impacts of the proposed action". 40 C.F.R. § 1502.9(a). Then, in the final EIS, the agency "shall discuss at appropriate points ... any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b).

 "NEPA requires that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to adverse opinions held by respected scientists." *Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473, 1482 (W.D.Wash. 1992); *affirmed*, 998 F.2d 699 (9th Cir. 1993). An EIS violates NEPA where it fails to "disclose and discuss the responsible opposing views." *Center for Biological Diversity v. Forest Service*, 349 F.3d at 1169. The Report and Recommendation concluded that plaintiffs did not demonstrate that the 2003 FSEIS failed to disclose and discuss those opinions as required by NEPA. As set forth below, plaintiffs' objections to the Report and Recommendation have persuaded the Court that the FSEIS does not properly disclose and discuss the views of dissenting scientists, and therefore is inadequate under NEPA.

 The Court is not required to decide whether the EIS is based on the best scientific methodology available, or to resolve disagreements among experts. In-

stead, the Court's task is to ensure that the procedure followed resulted in a reasoned analysis of the evidence. *Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473 (W.D.Wash.1992) (finding that the Forest Service was required to address in the FEIS scientific criticisms opposing evidence on which the final strategy was based). *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (NEPA "prohibits uninformed—rather than unwise—agency action.").

Here, plaintiffs contend that respected scientists expressed dissenting scientific viewpoints regarding the environmental impacts of the ACS amendment. This assertion is based on the fact that beginning in January, 2003, the Forest Service sought input from FEMAT members as to the intent behind the ACS, and submitted a questionnaire to these scientists. Some of the responses reflected the scientists' disagreement with the assertion that the amended ACS would be consistent with the original objectives of the ACS, particularly as to the requirement that projects be consistent with the ACS at the site, watershed, and landscape scales. Administrative Record, FS/BLM at 2251, 2256, 2259, 2264. These FEMAT scientists, who designed the ACS, expressed dissenting opinions and disagreement concerning potential negative cumulative effects of the ACS amendment. The FEMAT scientists are respected scientists and their views relevant. Furthermore, they were not alone in expressing dissent. FWS scientists submitted comments that the proposed language would "remove or weaken several key conservation provisions for aquatic species at the plan level" and eliminate the "assurance that projects developed and implemented under the ACS guidance will contribute to restoring and/or maintaining the ecological health of aquatic ecosystems." Administrative Rec-

ord, FS/BLM 5944. The FWS scientists further stated that "this outcome is of great concern to us." *Id.* at 5945.

These and other comments and dissenting opinions were not disclosed in the body of the FSEIS. Instead, buried in the appendices as a summary of public comments on the draft SEIS, is the following statement:

> The FEMAT Report is the best available science particularly on the specific issues being considered in the proposal, yet the proposal significantly diverges from the FEMAT regarding several important ACS provisions. The Draft SEIS offers no science in support of these departures, and in fact offers no discussion of the scientific issues surrounding these departures ... Importantly, the ACS EIS Team interviewed FEMAT scientists about the extent to which the changes that are now included in the Draft SEIS were consistent with their views of how the ACS was intended to function. On several key points the scientists' responses diverge from the actions taken in the proposal. For example, scientists indicated support for site-scaled evaluations of projects as they relate to meeting the goals of the ACS, and noted that some site-scale projects could be inconsistent with meeting the ACS objectives at the watershed or larger scales. Additionally, scientists stated that site-scaled compliance with Section C and D alone was not consistent with their view of how the ACS was designed to function.

2003 FSEIS, Appendix C, p. 57 (ellipses in original). The response of the agency to this comment states, in its entirety: "The scientist interviews were part of the scoping effort but did not yield consistent results. Agency scientists consistently emphasize the role of watershed analysis in providing context for project planning." *Id.*, p. 58.

This "disclosure" wholly fails to meet the standards for adequate disclosure and discussion of dissenting scientific opinions. The purpose of the appendix is to reproduce comments received by the agency on a draft EIS during the public comment period. Here, the draft EIS did itself not disclose any dissenting opinions. Therefore, the agency was required to "discuss at appropriate points ... any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). Here, the dissenting views of responsible scientists were neither set forth in substance, nor their import discussed, in the FSEIS.

Further, several of the FEMAT scientists' responses regarding original intent of the ACS were misrepresented in a different section of the appendix. One response from the FEMAT scientists was that "we think the language proposed in the Draft SEIS is not consistent with our original intent for the ACS so does not clarify its interpretation." Administrative Record, FS/BLM at 2259. Not only was this and similar critical statements not disclosed, they were misrepresented in this response to a citizen comment expressing concern over the proposed ACS amendment:

> **Comment:** The existing rules represent a consensus among the various parties who crafted the Northwest Forest Plan in 1994. We find it upsetting that the Forest Service now wishes to supplant this consensus by altering the scope of the ACS. The existing language of the ACS should be preserved without changes. The ACS rules are functioning exactly as intended. That is, they serve as a check against the rampant ecosystem destruction that has characterized so much of Forest Service policy.

**Response:** The various parties who crafted the Northwest Forest Plan did not intend for the ACS objectives to be interpreted as standards to be applies at all scales. The Draft SIES stated that the agencies have had difficulty planning and implementing projects that follow Northwest Forest Plan principles (as indicated by annual sale quantity sold). Part of the difficulty is due to impossible expectations raised by interpretations of ACS language.

2003 FSEIS, Appendix C, p. 44. This statement as to the intent of the drafters of the Northwest Forest Plan is contrary to the opinions that were actually expressed by the FEMAT scientists in response to the questionnaire.

 Even if the scientists' opinions had been adequately and accurately stated and discussed, their relegation to the comment and response section of the appendix was improper under NEPA. *Friends of the Earth v. Hall,* 693 F.Supp. at 934. Disclosures and discussions must be in the body of the EIS itself. *Center for Biological Diversity v. Forest Service,* 349 F.3d at 1169. Furthermore, within that body of the EIS, the agency must not only recite dissenting opinions, it must "analyze," "respond to" and "discuss" them. *Id.* at 1168. None of that was done here.

"Where the agency fails to acknowledge the opinions held by well-respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient." *Friends of the Earth v. Hall,* 693 F.Supp. at 934. As it did in that case, the Court concludes that the appropriate place to disclose and discuss the opposing views was in the body of the EIS, rather than in the comments and response section. *Id.* The FSEIS thus fails to meet NEPA standards, in that dissenting views were not disclosed and discussed at the appropriate point, nor with sufficient depth, to "inform decision-makers of the full range of responsible opinion on the environmental effects." *Id.*

**(3) Conclusion**

Accordingly, plaintiff's motion for summary judgment (Dkt.# 52) is GRANTED, and defendants' two motions for summary judgment (Dkt. ## 68, 69) are DENIED. It is hereby ORDERED that:

(a) the biological opinions on the amendment to the Aquatic Conservation Strategy of the Northwest Forest Plan ("ACS Amendment") issued by defendants NMFS and FWS are arbitrary, capricious, and contrary to the Endangered Species Act, 16 U.S.C. § 1536(a)(2), in violation of the Administrative Procedure Act, 5 U.S.C. § 706, and shall accordingly be set aside;

(b) the supplemental environmental impact statement (FSEIS) issued by defendants Department of Agriculture and Department of the Interior on the ACS amendments is arbitrary and capricious and contrary to the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), in violation of the Administrative Procedure Act, 5 U.S.C. § 706, and shall accordingly be set aside; and

(c) the ACS amendment adopted by defendants Department of Agriculture and Department of the Interior in the Record of Decision dated March 2004 fails to comply with NEPA and the ESA, and is accordingly set aside.

The parties shall advise the Court, within twenty days of the date of this Order, as to any further Court action necessary before final judgment is entered.

REPORT AND RECOMMENDATION

THEILER, United States Magistrate Judge.

*INTRODUCTION*

A coalition of organizations representing the interests of commercial fishermen

and/or environmental and conservation causes (plaintiffs) brought this suit against the National Marine Fisheries Service (NMFS),[1] United States Fish and Wildlife Service (FWS), United States Department of Agriculture (USDA), and United States Department of the Interior (DOI) (federal defendants). Douglas Timber Operators, Inc. and American Forest Resource Counsel (defendant-intervenors) intervened as defendants.

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkts.52, 68–69.) Plaintiffs request that the Court declare invalid and set aside the final supplemental environmental impact statement (FSEIS) and biological opinions (BOs) for amendments to the Aquatic Conservation Strategy (ACS), a component of the Northwest Forest Plan (NFP or NWFP). Specifically, they challenge the Endangered Species Act (ESA) and National Environmental Policy Act (NEPA) processes surrounding that amendment. Federal defendants and defendant-intervenors (collectively "defendants") counter plaintiffs' arguments in their cross motions for summary judgment. The Court heard oral argument on November 22, 2005.

For the reasons described below, the Court agrees with plaintiffs as to the BOs and with defendants as to the FSEIS.

### BACKGROUND

A. *NFP/ACS*

In the early 1990s, in response to ongoing controversy and litigation, President Clinton sought the creation of a comprehensive strategy for forest management within the range of the northern spotted owl. The government assembled the Forest Ecosystem Management Assessment Team (FEMAT) to develop alternative management options. A February 1994 FSEIS addressed those options, with modification, and identified "Alternative 9" as the preferred alternative. *See* FWS 6285 (1994 FSEIS).[2] In April 1994, the Secretaries of USDA and DOI issued a Record of Decision (ROD) adopting Alternative 9, which became known as the NFP. *See* NMFS II.A.7 (1994 ROD). The NFP amended resource management plans of the USDA's Forest Service (FS) and the DOI's Bureau of Land Management (BLM). It serves a two-fold purpose: (1) the need to protect the health of forest ecosystems; and (2) the need for a sustainable supply of timber and other forest products. 1994 ROD at 25–26.

The ACS addresses aquatic environments within the territory of the NFP and contains four basic components: (1) riparian reserves (buffer zones along water bodies); (2) key watersheds (best aquatic habitat, crucial to at-risk fish species and stocks and providing high quality water); (3) watershed analysis (or "WA") (documenting existing and desired watershed conditions); and (4) watershed restoration (long-term restoration of watershed health and aquatic ecosystems). *Id.* at B–12. Binding standards and guidelines within the ACS restrict certain activities. The ACS also contains nine objectives designed to maintain and restore properly functioning aquatic habitats:

1. Maintain and restore the distribution, diversity, and complexity of watershed and landscape-scale features to ensure protection of the aquatic

---

1. NMFS is also known as NOAA (National Oceanic and Atmospheric Administration) Fisheries.

2. Federal defendants submitted three administrative records, along with supplements, to the Court, cited here as NMFS ——, FWS, —— and FS/BLM ——. (Dkts.17–19.)

systems to which species, populations and communities are uniquely adopted.

2. Maintain and restore spatial and temporal connectivity within and between watersheds. Lateral, longitudinal, and drainage network connections include floodplains, wetlands, upslope areas, headwater tributaries, and intact refugia. These network connections must provide chemically and physically unobstructed routes to areas critical for fulfilling life history requirements of aquatic and riparian-dependent species.

3. Maintain and restore the physical integrity of the aquatic system, including shorelines, banks, and bottom configurations.

4. Maintain and restore water quality necessary to support healthy riparian, aquatic, and wetland ecosystems. Water quality must remain within the range that maintains the biological, physical, and chemical integrity of the system and benefits survival, growth, reproduction, and migration of individuals composing aquatic and riparian communities.

5. Maintain and restore the sediment regime under which aquatic ecosystems evolved. Elements of the sediment regime include the timing, volume, rate, and character of sediment input, storage, and transport.

6. Maintain and restore in-stream flows sufficient to create and sustain riparian, aquatic, and wetland habitats and to retain patterns of sediment, nutrient, and wood routing. The timing, magnitude, duration, and spatial distribution of peak, high, and low flows must be protected.

7. Maintain and restore the timing, variability, and duration of floodplain inundation and water table elevation in meadows and wetlands.

8. Maintain and restore the species composition and structural diversity of plant communities in riparian areas and wetlands to provide adequate summer and winter thermal regulation, nutrient filtering, appropriate rates of surface erosion, bank erosion, and channel migration and to supply amounts and distributions of coarse woody debris sufficient to sustain physical complexity and stability.

9. Maintain and restore habitat to support well-distributed populations of native plant, invertebrate, and vertebrate riparian-dependent species.

*Id.* at B–11.

B. *ESA Consultations on the NFP/ACS and Associated Litigation*

No aquatic species were listed as protected under the ESA within the range of the NFP at the time of its adoption. Subsequently, the Umpqua River cutthroat trout, salmon, steelhead, and bull trout were listed as endangered or threatened. These listings prompted FS and BLM, the "action agencies," to consult with NMFS and FWS, the "consulting agencies."

1. *NMFS's 1997 BO:*

In 1997, NMFS issued a BO concluding that continued implementation of the FS and BLM resource management plans as amended by the NFP/ACS was not likely to jeopardize species listed or proposed for listing or to destroy or adversely modify critical habitat. NMFS III.A.78 (1997 NMFS BO.) In so concluding, the BO noted that actions taken "must be consistent with ACS objectives." *Id.* at 23–24.

A number of the same plaintiffs in this case challenged the BO. This Court found that the BO adopted the concept of consistency with the ACS objectives as a basis for a no-jeopardy finding. *Pacific Coast Fed. of Fishermen's Ass'ns v. National Marine Fisheries Serv.*, No. C97–775R, 1998 WL 1988556, at **10, 12 (W.D.Wash. May 29, 1998) ("*PCFFA I*"). The Court stated: "Before a project can proceed, USFS and BLM must find that actions either meet, or do not prevent attainment of, the ACS objectives. The finding must be supported by an analysis of how the proposed management action will maintain the existing condition or restore it." *Id.* at *12. The Court upheld the BO, finding NMFS properly assumed compliance with the ACS on the programmatic level, but determined NMFS failed to ensure or verify ACS compliance on the site-specific or project level for various timber sales. *Id.*

The consulting agencies then began to assess consistency with the ACS objectives by focusing on the impacts of actions at the watershed level over a long period, as opposed to impacts at the site-specific level. *Pacific Coast Fed. of Fishermen's Ass'ns v. National Marine Fisheries Serv.*, 71 F.Supp.2d 1063, 1068 (W.D.Wash.1999) ("*PCFFA II*"). Plaintiffs again challenged the implementation of the NFP/ACS. This Court rejected NMFS's watershed level approach, finding that, *inter alia*, the 1997 BO required NMFS to ensure ACS compliance at all four spacial scales—regional, province (river basin), watershed, and site/project. *Id.* at 1069, 1072.

NMFS appealed the *PCFFA II* ruling. The Ninth Circuit preliminarily noted:

The NMFS is required under NFP to determine whether or not a project is likely to adversely affect a listed species. The NMFS is not required by NFP to determine ACS consistency. However, in PCFFA I, the district court held that NMFS was permitted to assume that implementation of projects under USFS's Land and Resource Management Plan ("LRMP") or BLM's Resource Management Plan ("RMP") would result in "no jeopardy" to the listed fish species if those projects were conducted in accordance with ACS. Therefore, because NMFS is allowed to equate ACS consistency with a no jeopardy finding, NMFS chooses to inquire into ACS consistency. Presumably, other methods of reaching a jeopardy determination are available to NMFS.

*Pacific Coast Fed. of Fishermen's Ass'ns v. National Marine Fisheries Serv.*, 265 F.3d 1028, 1034–35 (9th Cir.2001) ("*PCFFA Appeal*").

In response to NMFS's argument that the watershed was the proper level to evaluate ACS consistency because the NFP/ACS aims to restore millions of acres of forest lands, the Ninth Circuit stated:

Given that overall protection of forest and water resources is the concern of both NFP and ACS, it does not follow that NMFS is free to ignore site degradations because they are too small to affect the accomplishment of that goal at the watershed scale. For some purposes, the watershed scale may be correct, but NFP does not provide support for so limiting NMFS review.

*Id.* at 1035–36 (also stating that the general mission statement in the NFP as to maintaining and restoring ecosystem health at watershed and landscape scales "does not prevent site degradation and does nothing to restore habitat over broad landscapes if it ignores the cumulative effect of individual projects on small tributaries within watersheds.") The court concluded that "[a]ppropriate analysis of ACS compliance is undertaken at both the watershed and project levels." *Id.* at 1036.

The Ninth Circuit also noted that, "[a]lthough the NFP, FEMAT, and ACS do not appear to address the proper scale for implementation of ACS, they explain that spatial levels should be considered and that watershed consistency is a primary goal[,]" and that "the record contain[ed] no proof that the cumulative effect of site specific degradation was considered in reaching a no jeopardy opinion at the regional watershed level." *Id.* at 1036. It added:

> The district court's earlier decision to allow NMFS to assume no jeopardy from an ACS consistency finding appears to be linked to the belief that ACS consistency was to be measured at the project level. This approach seems reasonable as far as it goes. Any project that maintains or restores fish habitat presumably would not jeopardize the survival of the species. However, a project that degrades habitat at the project level must be included in any realistic study at the watershed scale. Its disregard of projects with a relatively small area of impact but that carries a high risk of degradation when multiplied by many projects and continued over a long time period is the major flaw in NMFS study. Without aggregation, the large spatial scale appears to be calculated to ignore the effects of individual sites and projects. Unless the effects of individual projects are aggregated to ensure that their cumulative effects are perceived and measured in future ESA consultations, it is difficult to have any confidence in a wide regional no-jeopardy opinion. Failure to account adequately for the cumulative effects of the various projects undermines the assumptions that the district court authorized NMFS to make in *PCFFA I*. If the effects of individual projects are diluted to insignificance and not aggregated, then Pacific Coast is correct in asserting that

> NMFS's assessment of ACS consistency at the watershed level is tantamount to assuming that no project will ever lead to jeopardy of a listed species.

*Id.* at 1036–37 (also noting that the FEMAT report "emphasized the importance of curtailing incremental aquatic habitat degradation because the effects of numerous actions can cause significant damage to fish species and their habitat.") The Ninth Circuit, therefore, affirmed this Court's ruling as to NMFS's watershed-level approach to ACS consistency. *Id.* at 1036–37.

### 2. *FWS's 2000 BO:*

In 2000, FWS issued a BO concluding that continued implementation of the FS and BLM resource management plans as amended by the NFP/ACS would not likely cause jeopardy to listed bull trout. FWS 7216 (2000 FWS BO at 82.) As with the 1997 NMFS BO, the 2000 FWS BO also explicitly required project-level consistency with ACS objectives. *Id.* at 49–50, 74.

Several environmental advocacy groups challenged the 2000 FWS BO as it related to four timber sales in bull trout habitat. The United States District Court in Oregon issued a preliminary injunction, concluding there "were serious questions on the merits as to whether the FWS acted arbitrarily and capriciously in failing to analyze the specific timber sales to determine whether they are consistent with ACS objectives." *Cascadia Wildlands Project v. United States Fish & Wildlife Serv.*, 219 F.Supp.2d 1142, 1149–50 (D.Or. 2002). FWS subsequently withdrew the targeted BOs. *See* FWS 3893.

### C. *2004 ACS Amendment*

Following the above-described court decisions, FS and BLM initiated the process of amending the ACS. Plaintiffs contend

that the demands of the timber industry prompted this process, while federal defendants point to the need to clarify their original intent of progress towards ACS objectives over the long term and at broad scales, and defendant-intervenors, as agreed to by federal defendants, assert the gridlock imposed on timber harvest by the requirement of project-level ACS consistency. Amendment of the ACS required the action agencies to comply with NEPA and NFP amendment processes, and the consulting agencies to issue BOs assessing the impacts of the amendments on listed fish species.

### 1. *NEPA Process:*

In November 2002, the action agencies published a Notice of Intent in the Federal Register as to the potential amendment of the ACS and sought input from concerned parties. *See* NMFS II.A.2 (2003 FSEIS at 16.) A draft EIS released in March 2003 contained two alternatives: (1) the "No Action" alternative; and (2) the "Proposed Action" alternative, wherein language would be amended/deleted with respect to the role of ACS objectives, standards and guidelines, and watershed analysis. NFMS II.A.3 (March 2003 Draft SEIS.)

The agencies issued the Final SEIS on the ACS Amendment in October 2003, adding "Alternative A," designated the "Preferred Alternative." 2003 FSEIS at 18. A variation of the Proposed Action alternative, Alternative A also added and deleted ACS language. *Id.* The 2003 FSEIS described the ACS Amendment as intended to clarify that the proper scales to evaluate progress toward achievement of the ACS objectives are the fifth-field watershed and broader scales,[3] that no

single project should be expected to achieve all ACS objectives, that watershed analysis is to be used to provide context for project planning, and that standards and guidelines that must be specifically addressed in project planning are those within Sections C and D of Attachment A to the NFP, rather than the entirety of Attachment A, which also includes the ACS objectives. *Id.* at 9–10.

### 2. *ESA Consultation:*

The action agencies submitted biological assessments (BAs) to the consulting agencies, prompting the initiation of consultation on the ACS Amendment. *See* FWS 1322 and 1441. On March 18th and 19th of 2004, FWS and NMFS issued BOs concluding that continued implementation of resource management plans within the area of the NFP, as amended by the 1994 ROD and as proposed for amendment in the 2003 FSEIS, was not likely to jeopardize the continued existence of listed species or to destroy or adversely modify critical habitat. FWS 1–79 (2004 FWS BO at 71) and NMFS I.A.I. (2004 NMFS BO at 1, 98). As discussed further below, in reaching this conclusion, FWS and NMFS relied on the fact that site-specific consultations would follow their programmatic BOs.2004 FWS BO at 71, 73 and 2004 NMFS BO at 27–29, 73–74, and 98. Both BOs deferred authorization of incidental take of listed species to project-level consultations.

### 3. *ACS Amendment:*

On March 22, 2004, USDA and DOI issued the ROD amending the ACS. FWS 2952–72 (2004 ROD). Asserting that language in the 1994 ROD hindered the action agencies' ability to follow NFP princi-

---

**3.** "Aquatic ecosystems are described as fields. The size of watershed determines its category. Fifth field ranges from 20–200 square miles and are referred to as watersheds." *PCFFA II,* 71 F.Supp.2d at 1068 & n. 9. "By contrast, a project site generally covers only a few sections (square miles) or fractions of sections." *PCFFA Appeal,* 265 F.3d at 1035.

ples and achieve its goals, the 2004 ROD contained the clarifications outlined in the 2003 FSEIS. *See* 2004 ROD at 4.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(e)). Here, the parties agree that this matter is appropriate for resolution on summary judgment.

### B. Standard of Review

The Court reviews NEPA and ESA compliance under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir.2002). Under the APA, the Court must set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The Court " 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

A court may not substitute its judgment for that of the agency. *Id.* Courts must also be "deferential to the agency's expertise in situations ... where 'resolution of [the] dispute involves primarily issues of fact.' " *Arizona Cattle Growers' Ass'n v. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir.2001) (quoted source omitted). Deference is particularly appropriate "when the agency is 'making predictions, within its area of special expertise, at the frontiers of science.' " *Id.* (quoted source omitted). However, while "[c]ourts will defer to an agency's technical or scientific expertise[,] .... this deference is not unlimited, and the presumption of expertise may be rebutted if the agency's decisions are based on science but are shown to be not reasonable." *Greenpeace v. National Marine Fisheries Serv.*, 237 F.Supp.2d 1181, 1187 (W.D.Wash.2002).

### C. Scope of Review

As a general rule, judicial review of agency actions is limited to the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir.2005). However, evidence outside the record may be considered in limited situations, such as when "necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' " where " 'the agency has relied on documents not in the record,' " " 'when supplementing the record is necessary to explain technical terms or complex subject matter,' " upon " 'a showing of agency bad faith[,]' " *id.* at 1030 (quoting *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*,

100 F.3d 1443, 1450 (9th Cir.1996)), or when the agency has "swept stubborn problems or serious criticism under the rug[,]" *National Audubon Soc'y v. United States Forest Serv.*, 46 F.3d 1437, 1447 (9th Cir.1993). The Ninth Circuit has stated that judicial review under § 706 of the APA must be based on the "whole record," which "includes everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir.1993). *See also Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1308 (W.D.Wash.1994) (in upholding the NFP, finding declarations properly considered to "explain the agency's actions or to determine whether its course of inquiry was inadequate."), *aff'd Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir.1996).

In this case, the Court found limited discovery warranted given that documents identified by plaintiffs "provide[d] a reasonable basis to believe that the agency actions challenged in this proceeding may have been influenced by the timber industry's proposal to amend the ACS, or that the timber industry's proposal may have been directly or indirectly considered by agency decisionmakers." (Dkt. 48 at 9–10.) The Court reserved for a later determination the question of whether the administrative record should be supplemented to include the discovery materials sought. (*Id.* at 11.) The Court noted that, should plaintiffs wish to seek supplementation of the record, they were to proceed by separate motion. (*Id.*)

Now, in alleging the timber industry exerted improper influence on the government, plaintiffs reference discovery responses depicting communications between the timber industry and federal agencies. For example, plaintiffs point to documents suggesting that the timber industry proposed and the agencies agreed to amend the ACS to limit the consistency requirement and the role of watershed analysis, and to allow for more timber sales to proceed. *See* Patti Goldman Decl. (Dkt.53, Exs.2–4.) [4]

Plaintiffs assert that the parties stipulated in their joint status report that discovery responses may be considered by the Court and note that they did not file a motion seeking to add these documents to the record based on their understanding of that agreement. Federal defendants aver their agreement only to not challenge authenticity or file a motion to strike, but their consistent stance that these documents are not part of any agency's record. (*See* Dkts. 34 and 48.)

Because it appears that the documents at issue were included in the information before the agencies in making their decisions, they are properly considered a part of the administrative record. *See Portland Audubon Soc'y*, 984 F.2d at 1548. However, as argued by defendants, plaintiffs do not demonstrate anything improper took place. Instead, they show only that the timber industry supported and, unsurprisingly, encouraged amendment of the ACS. *See, e.g., Louisiana Ass'n of Indep. Producers v. Federal Energy Regulatory Comm'n*, 958 F.2d 1101, 1113 (D.C.Cir.1992) ("Agency officials may meet with members of the industry both to facilitate settlement and to maintain the agency's knowledge of the industry it regulates."); *Sierra Club v. Costle*, 657 F.2d 298, 401 (D.C.Cir.1981) ("[T]he importance

---

**4.** Defendant-intervenors point out that language relied on by plaintiffs as purportedly quoting a timber industry proposal (*see* Dkt. 52 at 9) does not exist either in the document cited or anywhere else in the record. Plaintiffs clarify that the apparent quotation was, in fact, a summary of the content of the document at issue.

to effective regulation of continuing contact with a regulated industry, other affected groups, and the public cannot be underestimated.") As also noted by defendants, it is apparent from the previous PCFFA litigation that the government had sought a lesser role for the ACS objectives. Accordingly, the documents at issue did not assist the undersigned in reaching the conclusions contained herein.

### D. Jurisdiction to Review BOs

■ Federal defendants assert that the Court lacks jurisdiction to review the 2004 NMFS and FWS BOs. The APA limits review to "final agency action[s]." 5 U.S.C. § 704. Final agency action must (1) "mark the 'consummation' of the agency's decisionmaking process," and (2) "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]' " *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoted sources omitted). *Accord Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922, 925 (9th Cir.1999). The latter part of this two-part test is at issue here. *Cf. PCFFA Appeal*, 265 F.3d at 1033–34 ("[T]he issuance of a biological opinion marks the 'consummation' of NMFS's consultation process.")

In *Bennett*, the United States Supreme Court held that a BO and accompanying Incidental Take Statement (ITS) constituted final agency action in that they "alter[ed] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." 520 U.S. at 178, 117 S.Ct. 1154. The court distinguished cases in which a report "carried no 'direct consequences' and served 'more like a tentative recommendation[,]' " and where "recommendations were in no way binding" and allowed for "absolute

discretion[.]" *Id.* (citing and quoting *Franklin v. Massachusetts*, 505 U.S. 788, 798, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) and *Dalton v. Specter*, 511 U.S. 462, 478, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) respectively). The Supreme Court noted that the BO and ITS at issue in that case, by contrast, had "direct and appreciable legal consequences." *Id. See also PCFFA Appeal*, 265 F.3d at 1034 (upholding finding that a "no jeopardy" opinion, as compared to the jeopardy opinion at issue in *Bennett*, also constituted a final agency action given that it marked the end of the consultation process and had direct and appreciable legal consequences, in that "[a]s a practical matter the opinion and its accompanying Incidental Take Statement grant immunity to the proposed actions of other agencies required to obtain an NMFS opinion before proceeding with their own actions[.]")

Federal defendants assert that, without an accompanying authorization for "take," a BO by itself has no legal consequences. They point to language in the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), as supporting this limited interpretation of *Bennett*. In *Southern Utah Wilderness Alliance*, the Supreme Court quoted 5 U.S.C. § 551(13) as defining a final agency action to include an " 'agency rule, order, license, sanction, relief, or the equivalent or denial therefore, *or failure to act*.' " *Id.* (emphasis in original). Federal defendants assert that an ITS authorizing a take of endangered species is tantamount to a license for the purposes of the APA. *See Bennett*, 520 U.S. at 170, 117 S.Ct. 1154 ("Thus, the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the agency action to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.' ") and 5 U.S.C. § 551(8) (defin-

ing "license" to include "an agency permit"). They contrast a BO without an ITS as merely advisory—an opinion regarding the biological effects of an action.

However, *Southern Utah Wilderness Alliance,* although accurately defining "agency action" under the APA, addressed a "failure to act" challenge to a land use plan under 5 U.S.C. § 706(1), seeking to "compel agency action unlawfully withheld or unreasonably delayed." Plaintiffs here pursue a challenge under 5 U.S.C. § 706(2), seeking to "hold unlawful and set aside agency action" deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Accordingly, *Southern Utah Wilderness Alliance* is not controlling. *Cf. Environmental Prot. Info. Ctr. v. Blackwell,* 389 F.Supp.2d 1174, 1211–12 (N.D.Cal.2004) (stating that, because the case involved a challenge to a final agency action, rather than a failure to act, *Southern Utah Wilderness Alliance* was not controlling).

Instead, the undersigned finds the reasoning in *Cascadia Wildlands Project* instructive. *See* 219 F.Supp.2d 1142. In that case, the District Court of Oregon disagreed with the very position taken by federal defendants here, stating: "Whereas an Incidental Take Statement carries with it the assurance of immunity if a bull trout is taken, the absence of an Incidental Take Statement raises the potential of liability if a bull trout is taken." *Id.* at 1148. The court found that both the risk of peril in taking a bull trout and the agency's ability to use the no jeopardy conclusion in the BO in defense of its actions in a future proceeding were appreciable legal consequences. *Id.* These same appreciable legal consequences exist with respect to the BOs at issue here. Accordingly, federal defendants fail to establish a lack of jurisdiction to review the BOs.

## E. *ESA Challenges*

Section 7(a)(2) of the ESA requires federal agencies to examine their proposed actions in an effort to ensure that actions taken are "not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [critical] habitat[.]" 16 U.S.C. § 1536(a)(2). Forest management plans constitute agency actions subject to the mandates of § 7. *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1055 (9th Cir.1994); *Lane County Audubon Soc'y v. Jamison,* 958 F.2d 290, 294 (9th Cir.1992).

The consulting agencies must issue a BO "detailing how the agency action affects the species or its critical habitat," incorporating the best available science, and making a determination as to whether the action is likely to jeopardize the survival and recovery of listed species. 16 U.S.C. § 1536(a)(2) & (b)(3). The BO must consider "the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action." *Gifford Pinchot Task Force v. Fish & Wildlife Serv.,* 378 F.3d 1059, 1062 (citing 50 C.F.R. § 402.14(g)(2)-(3)), *amended on other grounds,* 387 F.3d 968 (9th Cir.2004). Cumulative effects are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. The consulting agencies must also issue an ITS upon determining that an action is likely to result in some incidental "take" of listed species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(h)(3)(I).

"A biological opinion is arbitrary and capricious if it fails to articulate a satisfactory explanation for its conclusions, relies on factors which Congress did not intend

for it to consider, or fails to consider an important aspect of the problem." *Greenpeace,* 237 F.Supp.2d at 1187 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). "Essentially, [the Court] must ask 'whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." ' " *PCFFA Appeal,* 265 F.3d at 1034 (quoted sources omitted). "A biological opinion may also be invalid if it fails to use the best scientific information as required by 16 U.S.C. § 1536(a)(2)." *Id.* (citing *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1993)). Arbitrary and capricious action may also result from an agency's failure to provide " 'reasoned analysis' " upon deviating from a previous position. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 57, 103 S.Ct. 2856 (quoting *Greater Boston Television Corp. v. Federal Commc'ns Comm'n,* 444 F.2d 841, 852 (D.C.Cir.1970)). For the reasons described below, the undersigned finds the 2004 BOs arbitrary and capricious.

1. *Reliance on Future Site–Specific Consultations:*

██ Plaintiffs challenge the consulting agencies' reliance on future site-specific consultations in rendering their no-jeopardy opinions.[5] Plaintiffs do not dispute the permissibility of "programmatic environmental analysis supplemented by later project-specific environmental analysis." *Gifford Pinchot Task Force,* 378 F.3d at 1062 (confirming approval of the above and citing *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir. 1994)). Instead, they differ with defendants as to the degree to which the initial

programmatic consultation must guide later site-specific or project-level consultations.

Plaintiffs argue that the consulting agencies failed to address the full effects of the amended forest plan, including its mechanisms (or lack thereof) for modifying harmful projects or curtailing adverse cumulative effects. *See, e.g., Conner v. Burford,* 848 F.2d 1441, 1453 (9th Cir.1988) (agency must "analyze the effect of the *entire* agency action" and render a "comprehensive biological opinion"; concluding FWS violated the ESA "by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action [including post-oil and gas leasing activities], and thus failing to adequately assess whether the agency action was likely to jeopardize ... threatened or endangered species, as required by Section 7(a)(2)."); *Greenpeace v. National Marine Fisheries Serv.,* 80 F.Supp.2d 1137, 1147–50 (W.D.Wash.2000) ("A biological opinion that is not coextensive with the identified agency action necessarily fails to consider the important aspects of the problem and is, therefore, arbitrary and capricious."; finding BO invalid for failing to assess full scope of individual and cumulative fishing allowed under fishery management plan). *See also Buckeye Forest Council v. United States Forest Service,* 378 F.Supp.2d 835, 843–44 (S.D.Ohio 2005) (upholding tiered consultation where programmatic consultation established conditions for subsequent site-specific consultations). They assert that, instead, the consulting agencies impermissibly relied on later, site-specific consultations to plug the loopholes left by removal of the ACS "sideboards" they pre-

---

5. The parties raise numerous and overlapping arguments in the voluminous briefing presented to the Court. However, for the purpose of expediency, this Report and Recommendation addresses only those arguments deemed critical to the resolution of this matter.

viously utilized to ensure against jeopardy. *Cf. Resources Ltd. v. Robertson,* 8 F.3d 1394, 1399–1400 (9th Cir.1993), *as amended in* 35 F.3d 1300, 1304–05 (1994) (prospect of later consultations with FWS did not excuse FS's arbitrary and capricious selection of an "unattainable ASQ [allowable sale quantity,]" of timber in a forest plan).

Federal defendants describe consultation at the programmatic level as inherently generalized, and assert the impossibility of speculatively consulting on the effects of actions not defined as to timing, location, or method of implementation. *See* 2004 FWS BO at 36–69 and 2004 NMFS BO at 70–95 (recognizing that, depending on when, where, and how specific projects are designed to occur, projects such as grazing, timber harvest, road building, mining, and forest restoration may adversely affect listed species). They aver that, here, the consulting agencies went as far as they could. Federal defendants also note that the ESA affords flexibility to agencies in determining an appropriate approach to consultation. *See Buckeye Forest Council,* 378 F.Supp.2d at 843–44 (noting that "tiered consultation is not explicitly described in the ESA or its implementing regulations" and that "[t]he tiering [of a site-specific BO to a programmatic BO] is an interpretation of how to go about following the directive of the implementing regulation."; agreeing that the agencies' interpretation of the regulations and their precise implementation was owed deference).

However, defendants do not successfully dispute the requirement that the consulting agencies render "comprehensive" BOs, analyzing "the effect of the *entire* agency action." *Conner,* 848 F.2d at 1453 (emphasis in original). *Accord Greenpeace,* 80 F.Supp.2d at 1147–50.[6] Moreover, the Ninth Circuit has held that incomplete information as to the precise location and extent of future activities does not excuse the failure to produce a comprehensive BO. *See Conner,* 848 F.2d at 1453–54 (noting that the agency could have determined whether activities in particular areas were fundamentally incompatible with the continued existence of species, and could have also identified potential conflicts between species and post-leasing activities due to cumulative impact).

In this case, the consulting agencies appeared to recognize the need for a comprehensive analysis in their earlier BOs. For example, NMFS's 1997 BO acknowledged the need to address more than simply the "overall long-term effects of implementing" the land management plans:

Although project-scale actions will still be subject to section 7 consultation, the NMFS finds that it is appropriate to consider the efficacy of LRMP/RMP direction to minimize and avoid adverse effects at the earliest project planning level. Consideration of the needs of Pacific salmonids is important at both levels of administrative unit decision making (i.e., management plan and project levels). While LRMPs and RMPs set goals and objectives, land allocations, and standards and guidelines that regulate the production of goods and services, consultation at the individual program or project scale is enhanced where there has been an opportunity to consider the full range of effects at the species

---

**6.** Defendants go to great lengths to distinguish these and other cases relied on by plaintiffs. However, although none of the cases present mirror images of the dispute currently before the Court, defendants' arguments do not distill the general propositions for which these cases stand. For example, in *Conner,* the Ninth Circuit addressed the "incremental step defense" pointed to here by defendants only after explaining the need for a comprehensive biological opinion. *See* 848 F.2d at 1454–58.

(ESU) scale under an ecosystem-based strategy applied at the LRMP/RMP scale. 1997 NMFS BO at 18.[7] Also, documents in the record reflect that the consulting agencies envisioned this same type of analysis in reviewing the amended ACS. For example, guidance issued by the Endangered Species Chief for the FWS region stated:

> Current national guidance on programmatic consultations instruct us to conduct the program-level consultation by assessing the "sideboards" beyond which individual projects under that program cannot extend. In order to complete an adequate analysis on the proposed ACS clarification, we must determine the boundaries beyond which we believe no additional effects will occur due to proposed projects. Subsequent projects will then be assessed to determine whether it is still within those boundaries established in the programmatic consultation.

FWS 3970. *See also* FWS 3324 (comments on draft SEIS NMFS submitted to FS: "[W]e need to identify any loopholes . . . which would allow projects to go forward that would not have been implemented. . . . [W]e cannot pretend these loopholes do not exist. . . . Any actions that could occur due to said loopholes need to be identified, addressed and analyzed in our plan-level consultation so that the analysis is logical and defensible.") [8]

Yet, in their final BOs, the consulting agencies essentially defer analysis to future site-specific consultations. In adopting a wholesale deferral of analysis to the project level, it cannot be said that the agencies satisfied their burden to "make certain" that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat. *Defenders of Wildlife*, 420 F.3d at 963–64 (defining § 7(a)(2)'s use of the term "insure" as above).[9] Additionally, as noted by plaintiffs, site-specific § 7 consultations will focus on a smaller area than the entire NFP and, based on the ESA's definition of cumulative effects, assess only those prior federal projects that have undergone consultation. *See* 50 C.F.R. § 402.02.[10] Deferral, therefore, also necessarily improperly curtails the discussion of cumulative effects.

However, while deferring analysis to the site-specific scale, the BOs also appear to rest on an assumption that those consultations will apply a draft analytical process attached as an appendix to the BAs. As described in the 2004 NMFS BO:

> Appendix 1 of the BA (included by reference) describes the process whereby the

7. This BO did, however, recognize that it was "generally not practical to provide a detailed review of all potential effects of all individual actions, as such an analysis would entail considerable conjecture about the specifics of hypothetical project design, timing and configuration[,]" but found the effects "generally predictable . . . because, by definition, they must be consistent with the ACS objectives." 1997 NMFS BO at 19 and 23–24.

8. Federal defendants' contention that this reasoning impermissibly rewrites § 7's standard prohibiting only actions likely to jeopardize listed species or destroy or adversely modify critical habitat is not well taken in light of the case law supporting the need for comprehensive programmatic BOs.

9. As noted by defendants, the action at issue in *Defenders of Wildlife*—the transfer of a federal program to a state—would have precluded further site-specific consultations given that § 7 applies only to federal actions. It is, therefore, relied on above only with respect to the definition of "insure."

10. Additionally, some projects may proceed by informal consultation, which does not assess cumulative impacts or the environmental baseline. *See* 50 C.F.R. § 402.13.

action agencies assess and mitigate the effects of land management activities at a variety of scales.... [T]his appendix also includes a detailed discussion of the process that the action agencies apply to project-level section 7 ESA consultations[.] Appendix 1 of the BA is considered to be part of the proposed action being evaluated in this Opinion.

... The determination of effects is dependent upon specific site and watershed physical and biological baseline conditions for a proposed action and the design and anticipated effects of the action itself. The four agencies ([FWS], [NMFS], BLM and USFS) have developed a draft analytical procedure for section 7 ESA consultation on listed fish species and critical habitat that is currently being evaluated on several test projects. It assesses impact at multiple scales, from site to watershed. Key features of the draft analytical procedure are:

1. Integration of the use of WA results, the NEPA analysis, and the ESA consultation process;
2. Specific identification and documentation of effects relative to the element of the proposed action that is causing it, and what life history stage of the fish is being affected;
3. A requirement to address eight factors of each effect (nature, proximity, timing, duration, probability, frequency, distribution, and magnitude);
4. Tracking of effects, on the landscape, of previous Federal actions and current proposed actions to determine aggregated effects, at the scale of watersheds.

The four agencies conduct ESA consultation using the "Streamlined Consultation Procedures for Section 7 of the [ESA]" ..., which is an interagency agreement. It established a hierarchy of teams from project-level consultation teams, known as Level 1 teams, to higher level teams for elevations of disputes. The Level 1 teams evaluate BAs and effect determinations. If formal consultation is required, the teams establish terms and conditions to be included in the respective [ITS s] accompanying the [BOs]. The terms and conditions are mandatory requirements that the action agencies must follow. The regulatory agencies are encouraged to participate in early phases of project development. This can result in design changes to projects to address environmental concerns.

2004 NMFS BO at 27. The analytical process has since been finalized for use in the preparation of BAs for certain timber sales under the NFP. (*See* Dkt. 69, Attach. B.)

Federal defendants assert that it is legally irrelevant that the action agencies did not adopt and expressly incorporate the draft analytical process. They assert that the draft process was simply a proposed amendment to the streamlining consultation procedures already in use and served to merely help ensure that sufficient information would be presented in BAs to allow the consulting agencies to make thorough and complete analyses for subsequent projects. They describe references to the draft process in the BOs as merely one aspect of the consulting agencies' acknowledgment that the agencies would necessarily engage in site-specific consultation on future projects, and that the agencies would work together to continue to improve how site-specific consultations would be performed.

However, rather than merely referencing the draft analytical process, the 2004 FWS BO essentially replaces reliance on consistency with ACS objectives at all scales, with reliance on the use of the analytical process in future site-specific consultations:

Actions implemented under the proposed action could result in adverse effects to the bull trout and its proposed critical habitat at scales smaller than the 5th field watershed. Consequently, the BA describes an analytical process designed to evaluate potential localized and short-term impacts to listed bull trout and proposed critical habitat. As described in the BA, resource values would be identified and potential impacts will be addressed during project design and the NEPA process, as well as during project-level ESA consultation. Through these analytical processes the physical and biological features that provide for the maintenance or creation, over time, of properly functioning freshwater aquatic habitat for the bull trout and its proposed critical habitat will be addressed, and this information will be used in the course of designing and implementing specific management activities.

*See* 2004 FWS BO at 39, 43–44 (internal footnotes omitted). *See also id.* at 5 ("The Appendix to the BA and the consultation streamlining procedures provide a framework for conducting ESA consultations on individual projects pursuant to the proposed action."), at 68–69 (describing the analytical process as a means "[t]o mini-

mize adverse effects to listed species or proposed critical habitat[.]"), and at 71–72 (reiterating above description of analytical process in giving reasons to support conclusion that the NFP as amended is not likely to jeopardize bull trout). Yet, the BO never addresses the discretionary nature of that framework.[11]

The 2004 NMFS BO does acknowledge the framework's discretionary nature by stating: "To fulfill obligations under section 7(a)(2) of the ESA for individual or groups of projects and to be exempt from section 9 take prohibitions, the administrative units *may* use the interagency consultation streamlining guidance (1999), or subsequent updated procedures, and the Level 1 process, to avoid jeopardizing the continued existence of listed salmonids." 2004 NMFS BO at 71 (emphasis added). However, this BO also contains misleading language regarding the process in stating that the document outlining it is "included by reference" and "considered to be part of the proposed action being evaluated". *Id.* at 27.[12] Moreover, as with the 2004 FWS BO, there is no discussion of the implications of the discretionary nature of this process and NMFS relies on the process in reaching its no-jeopardy conclusion. *See, e.g., id.* at 28–29 (stating that the streamlined consultation process, including

---

**11.** Plaintiffs assert that FWS's January 2004 draft treated the analytical process as a binding part of the proposed action and that FWS removed language reflecting that treatment on the insistence of the action agencies. The January 2004 FWS draft BO did state that the appendix containing the analytical process was "incorporated by reference into the proposed action[,]"and that the proposed action "includes" the analytical process, *see* Jan. 2004 draft FWS BO at 5, 69, 71, whereas the final 2004 BO says that the proposed action "provides for" the process as a framework, 2004 FWS BO at 5, 69, 71.

**12.** On this point, plaintiffs cite an email from a FWS employee comparing draft BOs on the ACS amendments:

Notably, NOAAF states that Appendix 1 of the BA (generally describes *the analytical process*) is "considered [the analytical framework] to be part of the proposed action being evaluated." Appendix 1 describes the analytical process, *but stops short of requiring.* In this section NOAAF never explicitly states an assumption that the process will be used. It simply describes the process, then says "This will result in a thorough understanding of environmental impacts and ESA effects at scales ranging from site to watersheds" (NOAAF BO pg 28).

FWS 1873 and 1875.

the draft analytical framework, "will result in a thorough understanding of environmental impacts and ESA effects at scales ranging from site to watersheds."; also stating: "Appendix 1 of the BA concludes that the design of projects has been, and will continue to be driven by the goals of the NWFP and shaped by land allocations, S & Gs, context provided by relevant information from WA, NEPA analysis (including public participation), site-specific BMPs, and the results of the streamlining consultation process during ESA consultation.")

Based on the above, it appears that the 2004 BOs premised their no-jeopardy findings, at least in significant part, on the assumption that the analytical process would be applied at the site-specific level. Yet, critically, the BOs fail to address the potential impact posed by projects proceeding without application of that discretionary process. *Cf. Northwest Ecosystem Alliance v. Rey*, 380 F.Supp.2d 1175, 1190 (W.D.Wash.2005) (finding agencies failed to comply with NEPA, in part, because the SEIS assumed that species would be added to discretionary "Special Species Status" programs, without analyzing potential impacts if that discretion was not exercised). The 2004 BOs, therefore, lack a "rational connection between the facts found and the choice made." *PCFFA Appeal*, 265 F.3d at 1034. For this reason, and for the reasons described above and below, the undersigned recommends that these BOs be found arbitrary and capricious under the APA.

## 2. *Reconciling Earlier and Current BOs:*

 Plaintiffs also argue that the consulting agencies impermissibly failed to ad-dress and reconcile their conclusions with the scientific findings made in their earlier BOs, which relied on the fact that site-specific projects would be consistent with the ACS objectives. *See, e.g., Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57, 103 S.Ct. 2856 ("agency changing its course must supply a reasoned analysis.") Defendants respond that the consulting agencies previously chose to use ACS consistency as a "proxy" for avoiding jeopardy and were free to choose a different approach to satisfy § 7. *See PCFFA Appeal*, 265 F.3d at 1034–35.

The consulting agencies were certainly free to adopt a different approach in reviewing the amended ACS. Indeed, the proposed amendment by its terms eliminated the previous approach from consideration. However, the agencies are not excused from supplying a reasoned analysis in changing their course. *See generally Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57, 103 S.Ct. 2856.

The BOs do not take the position that ACS-consistency is no longer required for a finding of no-jeopardy. Instead, they explain the proposed amendment and adopt an alternative approach, namely, a reliance on future site-specific consultations. Had this alternative been adequate, it could be said that the consulting agencies supplied a reasoned analysis in altering the course to their no-jeopardy findings. However, for the reasons described above, this alternative was not adequate. Accordingly, the undersigned agrees with plaintiffs that the consulting agencies arbitrarily and capriciously failed to reconcile their current BOs with their earlier findings.[13]

---

**13.** Plaintiffs also assert arbitrary and capricious error in the failure to address and reconcile the 2004 BOs with critiques and questions raised by agency scientists. *See, e.g.,*

*Defenders of Wildlife v. Environmental Protection Agency*, 420 F.3d 946, 973 (9th Cir.2005) (noting BO failed to spell out in any detail

## F. NEPA Challenges

NEPA imposes procedural, rather than substantive requirements. *See Marsh*, 490 U.S. at 371, 109 S.Ct. 1851; *Vermont Yankee Nuclear Power Corp. v. Natural Res.'s Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Pursuant to NEPA, federal agencies must prepare an EIS for federal actions significantly affecting the environment. 42 U.S.C. § 4332(2)(C).

The Court reviews an agency's actions under NEPA "to determine if the agency observed the appropriate procedural requirements." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 665 (9th Cir. 1998). The Ninth Circuit has described the review of an EIS under NEPA as "extremely limited[,]" including a determination as to whether the EIS " 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' of a challenged action." *National Parks & Conservation Ass'n v. United States Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir.2000) (quoting *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987)). Upon determining that the agency took a " 'hard look' " at the environmental consequences of an action, the Court's review is at an end. *Id.* (quoting *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992)).

Plaintiffs group the alleged NEPA violations at issue here into three categories. However, as discussed below, the undersigned concludes that plaintiffs fail to establish that the 2003 FSEIS was arbitrary and capricious.

### 1. Assessing Significant Aquatic Habitat Impacts:

An EIS must assess and disclose direct and indirect effects, 40 C.F.R. §§ 1502.16, 1508.8, and consider " 'every significant aspect of the environmental impact of a proposed action[,]' " *Kern v. Bureau of Land Management*, 284 F.3d 1062, 1066, 1073 (9th Cir.2002) (NEPA requires agencies to "articulate, publicly and in detail, the reasons for and likely effects of ... decisions, and to allow public comment on that articulation.") (quoting *Baltimore Gas & Elec. Co. v. Natural Res.'s Def. Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). Applying a " 'rule of reason,' " the Court must determine " 'whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001) (quoting *Trout Unlimited. v. Morton*, 509 F.2d 1276, 1283 (1974)).

Plaintiffs point to increased logging, mining, grazing, and other land disturbing

concerns of staff as to harm posed to specific species and finding that, in failing to consider the impact on those species, the BO " 'failed to consider an important aspect' " of the action at issue) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856). Yet, although supporting the existence of disagreement between certain consulting agency scientists and the action agencies, wherein the scientists sought to retain the project-level ACS consistency requirement, the documents relied on by plaintiffs do not, in and of themselves, support the conclusion that the final BOs were arbitrary and capricious. *See, e.g., National Wildlife Fed'n v. United States Army Corp. of Eng'rs*, 384 F.3d 1163, 1174–75 (9th Cir.2004) (rejecting argument that content of email and attachment demonstrated conclusions in ROD were arbitrary and capricious; noting email was an informal, inter-agency communication and that the attachment was a "compilation of ideas" under discussion, "preliminary, and not the official view of the agency."); *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. at 1308 (upholding 1994 adoption of NFP despite the inclusion of "many documents reflecting dissenting opinions and a variety of views on all subjects" in the administrative record).

activity expected as a result of the amended ACS. *See* 2003 FSEIS at 52 (noting projects "hindered" by former interpretation of ACS). *See also id.* at 7–9 (describing timber sales blocked by *PCFFA* litigation) and at 41–43 (discussing timber sales authorized but not completed as a result of *PCFFA* litigation). They assert that the 2003 FSEIS states only the following with respect to the expected increase in timber sales: "All of the alternatives would result in impacts within the range predicted in 1994."; and "For instance, timber harvest removes canopy and exposes some land to accelerated erosion. Road work associated with the timber sale may result in short-term sedimentation." 2003 FSEIS at 50–51. Plaintiffs aver the insufficiency of this discussion under NEPA. *See Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1213 (9th Cir.1998) ("[G]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided.") (quoted source omitted); *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1473, 1482 (W.D.Wash.1992) (agency may not "rely on conclusory statements unsupported by data, authorities, or explanatory information."), *aff'd,* 998 F.2d 699 (9th Cir.1993).[14]

Plaintiffs also argue that, given the expected increase in activity and given the removal of the safeguards presumed in the prior assessment, the 2003 FSEIS unreasonably relies on the analysis from the 1994 FSEIS. In particular, they aver the failure to address the impact from site-specific projects proceeding without being considered in aggregation, and the failure to address the impact to areas outside riparian reserves.

In addition to the statements pointed to by plaintiffs above, the 2003 FSEIS states in assessing environmental effects:

Neither the Proposed Action nor Alternative A changes the predicted effects of Alternative 9 in the [NFP.] Physical and biological effects are adequately described in the 1994 FSEIS

The [NFP] acknowledges that disturbances are natural occurrences within forested habitats and that management of this habitat without disturbance is impossible. Some level of disturbance is necessary, even beneficial to the ecosystem. The clarified language for the ACS would result in improved decisions that reflect these concepts.

Short-term adverse effects associated with disturbance (such as increased turbidity or streambed sedimentation) accrue from activities such as culvert removal and replacement, road obliteration, and other restoration activities in riparian areas or streams. These actions are intended to provide for long-term benefit to aquatic and riparian habitats.

The risk of adverse short-term, site-level impacts would increase proportionately to the amount of work implemented. Extent and duration of these effects would be considered in project-level analysis.

The agencies considered the potential effects of the proposed amendment (Pro-

---

**14.** Plaintiffs also compare this lack of analysis with the impacts described in the BOs. For example, NMFS stated:

Timber harvest has the potential to reduce streamside canopy levels which may result in increased streamside temperature and reduce the supply of large woody debris; and accelerate surface erosion and mass wasting causing increased sediment delivery and turbidity in streams. Timber harvest often alters a normal stream flow pattern, particularly the volume of peak flow ... and the base flow ... by reducing the number of trees.

2004 NMFS BO at 73.

posed Action/Alternative A) on a variety of wildlife, fish, and plant species of concern. A Biological Evaluation (BE) was prepared that addresses species listed or proposed under the [ESA], as well as [FS] sensitive species and their habitats within the [NFP] area.

The change in language does not approve any specific projects and would not result in any effects on species or habitat. Further disclosure under NEPA and the ESA would occur before specific projects would be approved. The BE states that the proposed amendment "would have no effect to any ESA-listed species, or on designated or critical habitat." As Appendix B demonstrates, the proposed amendment would not alter any [NFP] conclusions or assumptions related to species variability. Forest Service biologists have also determined that the proposed amendment would have "no impact" on any sensitive species identified on the Region 6 and 5 Regional Forester's Sensitive Species Lists. The species lists and BE are included in the analysis files.

2003 FSEIS at 55–56. *See also id.* at 53–54 (stating, *inter alia,* that the No Action alternative is more likely to result in harvest levels like that of Alternative 1 under consideration in the 1994 SEIS). It goes on to describe the results of an attached BA, which stated that adverse impacts allowed by the amended ACS would be short-term. *Id.* at 56–57.[15] As such, although unquestionably not rising to the level of the some 500 page analysis in the 1994 FSEIS, *see* FWS 6285–6838, plaintiffs exaggerate the dearth of impact assessment within the 2003 FSEIS. The question remains, however, as to whether the action agencies reasonably supplemented this assessment through reliance on the environmental analysis contained in the 1994 FSEIS.

Federal defendants note that the 2003 FSEIS found no significant new information or changed conditions since the publishing of the 1994 FSEIS, and proposed no greater production of forest timber than that disclosed and analyzed in the 1994 FSEIS. 2003 FSEIS at 6–7, 41–42, 45, 49–51, and 55–56. They argue that the amendments to the ACS did not impose any fundamental changes and, rather, merely served to clarify ambiguities in ROD language that had caused confusion both within the agencies and in the courts, and to allow achievement of the resource production goals already analyzed in the 1994 FSEIS. *Id.* at 6–10. Federal defendants also point to the programmatic nature of the 2003 FSEIS, which, like its predecessor, did not disclose site-specific impacts. *Compare Salmon River Concerned Citizens,* 32 F.3d at 1357 ("[W]hen an impact statement is prepared, site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development. In studying a particular project, the amount of application, the proximity of the project site to the public, the number of workers, and the number of applications, may raise new and significant environmental impacts that were not previously discovered.") (internal cited sources omitted), *with Blue Mountains Biodiversity Project,* 161 F.3d at 1213 (cited by plaintiffs above and addressing adequacy of a site-specific EIS). They note that site-specific consultations will still occur under NEPA and ESA, both of which include consideration of cumulative effects, that watershed analysis and the 2001 Aquatic Riparian Effectiveness Monitoring Plan will assist in monitoring aggregate watershed effects, and that the

---

**15.** However, as noted by plaintiffs, this BA was not completed until October 2003, well after the release of the March 2003 draft SEIS for public comment.

amended ACS requires that monitoring results be used to evaluate over time the progress made by achievement of ACS objectives at the fifth-field watershed and larger scales. *See* 2004 ROD at 8, 14.

Plaintiffs counter that, while the plan SEIS need not assess the locations and site-specific impacts of particular projects, it must capture the landscape view and aggregate the impacts of the permitted activities over time. They maintain that the plan level is the only stage at which those impacts can be fully assessed. *See Natural Res.'s Defense Council v. United States Forest Serv.*, 421 F.3d 797, 814–16 (9th Cir.2005) (rejecting argument that forest plan FIS need not disclose cumulative effects because it only established guidance and effects will be studied at the future, site-specific level) and *Salmon River Concerned Citizens*, 32 F.3d at 1355 & n. 15 (site-specific EISs focus only on site-specific impacts).

Plaintiffs also reject the argument that the amended ACS imposes no fundamental changes, asserting that defendants ignore the *PCFFA* decisions reading the ACS and the 1997 NMFS BO to require the use of watershed analysis to ensure that each project would promote attainment of the ACS objectives. They point to this Court's decision in *Northwest Ecosystem Alliance* in connection with the elimination of another component of the NFP:

> Even if including the Survey and Manage standard as part of the Plan was a policy choice by the Agencies in 1994, just as eliminating the standard is the Agencies' policy choice in 2004, the Agencies have an obligation under NEPA to disclose and explain on what basis they deemed the standard necessary before but assume it is not now.

380 F.Supp.2d at 1192–93.

Federal defendants distinguish *Northwest Ecosystem Alliance* as reflecting a change in policy, rather than a clarification of language. They reiterate that their interpretation of the ACS language was different than that adopted by the courts in the *PCFFA* litigation and that the amendment corrects the language to clarify their intent. Also, with respect to *Natural Res.'s Defense Council v. United States Forest Serv.*, 421 F.3d at 814–16, federal defendants note that plaintiffs have not challenged the cumulative impact analysis in either FSEIS.

The *PCFFA* decisions found a basis for the ACS consistency requirement not only in the BO at issue, but also in the NFP/ACS itself and the FEMAT report on which it was based. *See PCFFA II*, 71 F.Supp.2d at 1070, 1073 (stating the FEMAT report "stressed (and indeed this court held in its prior decision) that the ACS strategy must be implemented at all four spatial scales[,]" and that NMFS was required to ensure compliance at all of those scales by the "Northwest Forest Plan and the Programmatic Biological Opinion.") and *PCFFA Appeal*, 265 F.3d at 1035–37 (stating that "[a]lthough the NFP, FEMAT, and ACS do not appear to address the proper scale for implementation of ACS, they explain that spatial levels should be considered and that watershed consistency is a primary goal[,]" and that "the record contain[ed] no proof that the cumulative effect of site specific degradation was considered in reaching a no jeopardy opinion at the regional watershed level."; further discussing cumulative impact of site-specific degradation, as quoted above). Accordingly, federal defendants' blithe assertion that the amendments to the ACS impose no fundamental changes is troublesome.

However, there is nonetheless an absence of evidence that the action agencies

presumed project-level ACS consistency in rendering their 1994 assessment. None of the excerpts plaintiffs cite from the 1994 FSEIS itself support such a contention. *See* 1994 FSEIS at 3 & 4–63 ("The [ACS] was designed to incorporate all elements of the aquatic and riparian ecosystem necessary to maintain the natural disturbance regime.") and 3 & 4–107 ("The effects to water quality under the alternatives vary depending on the acreages and distribution of the various land allocations and the type and location of land-disturbing activities," most significantly "the Riparian Reserve scenarios, the level and location of road building, and the amount and methods of timber harvest permitted."; "Based on the Riparian Reserve scenarios and other components of the [ACS], all of the alternatives except 7 and 8 are expected to maintain and improve water quality[.]"; "The broad scale adoption of the full [ACS] ... will significantly reduce the potential for adverse cumulative effects to water quality."; "Land disturbances will be more localized and related primarily to land allocations and the standards and guidelines that apply.") [16] Moreover, as noted by defendants, neither FSEIS dealt with site-specific impacts, which will be assessed in subsequent site-specific consultations.

The undersigned also finds relevant the fact that the 2003 FSEIS authorizes no greater production of timber than that authorized by its predecessor. That is, plaintiffs do not demonstrate that the expected increase in activity was not originally accounted for in the 1994 FSEIS assessment. In fact, the 2003 FSEIS notes that the agencies were not able to implement projects partly because of the court interpretations in the *PCFFA* litigation. *See* 1994 FSEIS at 41. It also considers other events and actions that have occurred since 1994. *See id.* at 35–47.

In sum, it is not clear to the undersigned in what respects the 1994 FSEIS did not adequately assess impacts, cumulative or otherwise, on the programmatic level even in light of the amendments to the ACS. Nor is it clear that subsequent site-specific consultations will not adequately assess such impacts. Without such a showing, it cannot be said that the 2003 FSEIS arbitrarily and capriciously tiered to the extensive assessment in the 1994 FSEIS.

### 2. *Disclosure of Dissenting Views:*

"NEPA requires that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to adverse opinions held by respected scientists." *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. at 1482 (finding agency's explanation insufficient "not because experts disagree, but because the FEIS lacks a reasoned discussion of major scientific objections.") *See also Center for Biological Diversity v. Forest Serv.,* 349 F.3d 1157, 1169 (9th Cir.2003) (EIS violated NEPA in failing to "disclose and discuss the responsible opposing views.") and *Friends of the Earth v. Hall,* 693 F.Supp. 904, 924–25, 934 (W.D.Wash.1988) ("Where the agency fails to acknowledge the opinions held by well respected scientists concerning the hazards of the proposed action, the EIS is fatally deficient."; finding appropriate point to disclose and address views of key resource agencies (FWS and NMFS) was in the body of the EIS, rather than the comments and response section). Plaintiffs here argue that the 2003 FSEIS

---

**16.** It should be noted that references to meeting ACS objectives at 3 & 4–68, 3 & 4–194, and 3 & 4–195 of the 1994 FSEIS refer to riparian reserves.

failed to disclose and adequately address the scientific views of the FEMAT scientists in violation of NEPA.

Plaintiffs note that, beginning in January 2003, FS sought input from FEMAT members as to the intent behind the ACS. *See* FS/BLM 2212–26; *see also id.* at 2197 (questionnaire undertaken to ensure "that in our proposed clarifying language we are representing the framers' intentions of ACS objectives relative to S & Gs" and to develop "a record of the Scientists' intent"). They point to responses reflecting disagreement with the elimination of the ACS objective consistency requirement and undermining the assertion that the amended ACS is consistent with the original intent. *See* FS/BLM 2256, 2259 (Kelly Burnett and Michael Furniss emphasized that analysis "at multiple scales is essential for evaluating project consistency with the ACS objectives," and that FEMAT "anticipated that each proposed project would be evaluated based on its consistency with ACS objectives at the site, watershed, and landscape scales."; "[W]e think the language proposed in the Draft SEIS is not consistent with our original intent for the ACS so does not clarify its interpretation."); *id.* at 2251 (Jack Williams noted that "it was the intent of the FEMAT scientists that both site-specific and watershed scales be considered in project evaluation."); *id.* at 2264 (Fred Swanson indicated that the "most important point" is to consider "consequences of proposed actions over local (project) and broader (watershed) spatial scales and over the short term (days to a few years) and long-term (decades to centuries) temporal scales."); and *id.* at 2605 (FEMAT aquatic team co-leader Gordan Reeves asserted that if "all projects ended up with short-term negative effects in a relatively short time then you would not meet the intent of the ACS and you would not achieve the ACS objectives.")

Plaintiffs also note that, while acknowledging some of the disagreement, the 2003 FSEIS nonetheless states that the "various parties who crafted the [NFP] did not intend for the ACS objectives to be interpreted as standards to be applied at *all* scales." 2003 FSEIS at C–44. *See also id.* at C–87 ("There is no evidence that the authors of the 1994 FSEIS intended [the current] interpretation [of the ACS.]") They aver that, particularly because the agencies cloaked the need for the amendment as clarifying original intent, they must fully and fairly disclose evidence amassed regarding that intent.

Finally, plaintiffs point to language in a summary of the surveys contradicting the statement in the 2003 FSEIS that the interviews "did not yield consistent results." 2003 FSEIS at C–58. *See* FS/BLM 2268–69 (noting a "[g]eneral [s]imilarity" of comments on a number of points, including the need to evaluate ACS objectives at the site level and the fact that the standards and guidelines alone "may not meet the ACS objectives where cumulative effects of individual actions occur.") Plaintiffs add that a perceived inconsistency does not eliminate the duty to respond to comments and discuss responsible opposing views.

The 2003 FSEIS included a comment regarding the questionnaire responses of the FEMAT scientists described above:

> The FEMAT Report is the best available science particularly on the specific issues being considered in the proposal, yet the proposal significantly diverges from FEMAT regarding several important ACS provisions. The Draft SEIS offers no science in support of these

departures, and in fact offers no discussion of the scientific issues surrounding these departures ... Importantly, the ACS EIS Team interviewed FEMAT scientists about the extent to which the changes that are now included in the Draft SEIS were consistent with their views of how the ACS was intended to function. On several key points the scientists' responses diverge from the actions taken in the proposal. For example, scientists indicated support for site-scale evaluation of projects as they relate to meeting the goals of the ACS, and noted that some site-scale projects could be inconsistent with meeting the ACS objectives at the watershed or larger scales. Additionally, scientists stated that site-scale compliance with Section C and D alone was not consistent with their view of how the ACS was designed to function.

2003 FSEIS at C–57. The 2003 FSEIS, therefore, did disclose the views of these scientists.

Admittedly, the response to the above comment was rather cursory: " *The scientist interviews were part of the scoping effort but did not yield consistent results. Agency scientists consistently emphasize the role of watershed analysis in providing context for project planning.*" *Id.* at C–58 (emphasis in original). However, because not all of the FEMAT scientists concurred, plaintiffs do not demonstrate the inaccuracy of the response. *See, e.g.,* FWS 3596 (Bruce McCannon disagreed with the court interpretation); FWS 3598 (Dr. Gordon Reeves stated: "What we are seeing from the Scientists is a difference of opinion[.]"); FWS 3602 (Gordon Grant stated the ACS objectives "were *not* intended as immutable standards against which specific proposed actions should be judged.") (emphasis in original); FWS 3605 (Jack E. Williams stated his belief that "ACS objectives ... primarily operate at broader spatial and temporal scales[,]" and agreed "that site-specific projects should be assessed for their compliance with ACS Standards and Guidelines[,]" and that "[a]s some of the S & Gs refer back to ACS objectives, ... if projects comply with S & Gs, than in the long run and at the landscape scale the ACS objectives should be met.")

Moreover, as asserted by federal defendants, the 2003 FSEIS also described the debate over the role of the ACS objectives as it played out in the *PCFFA* litigation, and discussed the supportive opinions of both FEMAT team member Dr. Gordon Reeves and the Regional Ecosystem Office (REO). *See* 2003 FSEIS at 6–9 (description of *PCFFA* litigation), at 12–16 (noting Dr. Reeves described the ACS objectives as providing " 'a framework for managing aquatic ecosystems at the watershed and landscape (i.e. multiple watershed) scale[,]' " and " 'not intended to be a hard set of criteria that could or can be applied equally at all spatial scales of concern (i.e. site, watershed, province and region).' "; as well as the REO's clarification that " 'the watershed scale is the appropriate landscape context for determining whether actions are consistent with the ACS objectives.' "), and at App. A. (attaching Dr. Reeves's declaration from the *PCFFA* litigation and the REO memorandum). *See also id.* at C–59 to C–62 (responding to numerous comments regarding Dr. Reeves's opinions and declaration). Accordingly, taken as a whole, the 2003 FSEIS adequately responded to the opposing views of the FEMAT scientists.

The 2003 FSEIS does contain potentially misleading language in referring to ei-

ther intent generally, or the intent of "[t]he various parties who crafted the [NFP]" in particular, without making note of the FEMAT team members who differed with the view of intent expressed. *Id.* at 1 ("These objectives were never intended to be site-specific standards, rather, they were intended to be achieved at the fifth-field watershed scale and broader, over the long term."), at C44 (referring to "[t]he various parties who crafted the [NFP]" and quoted in full above), and at C87 (referring to "the authors of the 1994 FSEIS" and quoted in full above). However, because the document also discloses the contrary views of the FEMAT team members, the 2003 FSEIS as a whole can be fairly read as reflecting the action agencies' own intent. Also, it should be noted that the 2003 FSEIS does not explicitly state that the ACS amendment reflects the intent of the FEMAT framers. For all of these reasons, plaintiffs do not demonstrate that the 2003 FSEIS failed under NEPA to disclose and discuss the contrary views of the FEMAT scientists.[17]

### 3. *Range of Alternatives:*

NEPA requires that an EIS contain a discussion of the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii), (E). The agency must "[r]igorously explore and evaluate all reasonable alternatives" and must disclose its reasons for eliminating a proposed alternative. 40 C.F.R. § 1502.14. The range of alternatives to be considered is guided by the statement of purpose and need. *See City of Carmel–By–The–Sea v. Department of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). *See also Westlands Water Dist. v. United States Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.2004) (range of alternatives need not extend beyond those reasonably related to purposes of project).

The existence of an " 'available, but unexamined alternative renders an environmental impact statement inadequate.' " *Idaho Conserv. League v. Mumma*, 956 F.2d 1508, 1519–20 (9th Cir.1992) (quoting *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985)). The agency need not, however, select the environmentally preferable alternative. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.")

Here, the Final EIS asserted as its purpose and need clarification regarding the ACS objectives based on court interpretation of the ACS:

Projects intended to achieve [NFP] goals have been delayed or stopped due to misapplication of certain passages in the ACS. Specific language has been interpreted to mean that every project must achieve all ACS objectives at all spatial and temporal scales. This interpretation suggests land managers must

---

**17.** Defendant-intervenors contend that this issue involves merely a policy and analytical debate, rather than a scientific dispute over environmental effects. However, as noted by plaintiffs, this Court has deemed the FEMAT report the best available science on the forest habitat needs of salmonids. *PCFFA II*, 71

F.Supp.2d at 1069. *See also* 2003 FSEIS at 3 ("The 1993 [FEMAT] report provides the scientific basis for the [NFP] and [ACS].") Therefore, the 2003 FSEIS appropriately disclosed and responded to the contrary views of FEMAT scientists.

demonstrate that a project will maintain existing conditions (or lead to improved conditions) at every spatial and temporal scale. Any project that may result in site-level disturbance to aquatic or riparian habitat, no matter how localized or short-term, could be precluded under this interpretation. This interpretation establishes an impossible expectation for demonstrating that a project follows the ACS.

See 2003 FSEIS at 6–7.

Plaintiffs argue that the action agencies failed to consider all reasonable alternatives by narrowly defining the amendment's purpose and need statement. See City of Carmel–By–The–Sea, 123 F.3d at 1155 ("[A]gency cannot define its objectives in unreasonably narrow terms.") They note this Court's acknowledgment that evidence of site scale degradation "does not, standing alone, constitute ACS noncompliance[,]" PCFFA II, 71 F.Supp.2d at 1070, and aver that the record belies the depiction of project gridlock, s ee FWS 3893 ("Section 7 consultation is successfully proceeding for all terrestrial species (e.g., we've approved around 50K acres of late-successional forest for harvest in the last year alone—all we were asked to consult on). And for aquatic species (the FWS at least) continues to successfully consult . . .—the FWS only had one consultation challenged in court . . ., and we withdrew it because we agreed it was poorly done.") They further reject the

assertion in the 2003 FSEIS that the ACS as interpreted inhibited watershed restoration projects. See 2003 FSEIS at 7, 54 and Pacific Coast Federation of Fishermen's Ass'ns v. National Marine Fisheries Serv., No. C00–1757R, Slip Op. (W.D.Wash. Dec. 7, 2000) (clarifying that only logging, not beneficial restoration projects as assumed by NMFS, were enjoined) and FS/BLM 2251, 2258 (FEMAT scientists' views regarding viability of restoration projects with only short-term impacts).

However, the 2003 FSEIS merely states that projects that may result in site-scale disturbance "could be precluded[,]" [18] and that "projects"—not all projects—have been "delayed or stopped[.]" 2003 FSEIS at 6 (emphasis added). Plaintiffs do not establish either that the FSEIS failed to accurately depict the PCFFA litigation and its consequences, or that the desire to increase the number of projects is unreasonable. See also 2003 FSEIS at 9 ("NOAA Fisheries has not issued any biological opinions covering timber sales in the [NFP] area since 1999.") and at 41–42 (showing timber sales falling substantially below amount authorized under the NFP). Moreover, the 2003 FSEIS acknowledged this Court's authorization of certain restoration projects, and plaintiffs do not dispute its description of the relationship between timber sales and restoration projects: "Timber sales are used to accomplish hazardous fuels reduction, restoration silviculture, and forest

18. Responding to plaintiffs' suggestion that the PCFFA decisions did not require every project to meet all ACS objectives, defendant-intervenors note that PCFFA advocated that very position in their complaints and that plaintiffs continue to do so in other litigation. Plaintiffs state that allegations made in complaints provide a tenuous, speculative basis for the 2003 FSEIS's interpretations of the PCFFA litigation. They do not, however, dispute the assertion made. See, e.g., 2003 FSEIS at 9 ("At least three pending lawsuits have been filed that allege that proposed projects do not follow the ACS because they do not maintain the existing riparian and aquatic condition at every scale[.]") (citing lawsuits in footnote).

health thinning. Frequently, timber sales provide the opportunity and funding for culvert removal and replacement." *Id.* at 7–8. For these reasons, plaintiffs fail to establish that the narrowing of objectives to eliminate alternatives requiring project-level consistency with the ACS objectives, other than the No Action alternative, was unreasonable. *See City of Carmel–By–The–Sea,* 123 F.3d at 1155–57 ("[A]gency cannot define its objectives in *unreasonably* narrow terms."; disagreeing that project goal was unreasonable because, *inter alia,* an alternative goal would have been "tolerable") (emphasis added).[19]

Plaintiffs also put forth the availability of more modest revisions to the ACS. They suggest that, for example, the amendment could have required that each project be consistent with the ACS objectives, but clarify that many of the objectives will only be met by multiple projects over time at the watershed scale. Plaintiffs note that the agencies rejected this type of alternative as "very similar to existing text," *see* 2003 FSEIS at 31, but assert a substantial difference between evaluating consistency at all relevant scales and determining whether *each* ACS objective must be met at *every* scale. *See, e.g.,* FS/BLM 2259 (FEMAT scientists Burnett and Furniss stated: "We recognized that although compliance of a project with some ACS Objectives can be ascertained at all three scales

[site, watershed, and landscape], compliance with other ACS Objectives can be ascertained only at the watershed or landscape scale.")

However, the substantial difference averred by plaintiff is elusive. As argued by federal defendants, plaintiffs' proposed alternative would likely raise the same semantic debates about language the agencies sought to eliminate through amendment of the ACS. An agency need not "undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" *Westlands Water Dist.,* 376 F.3d at 868 (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1181 (9th Cir.1990)). Accordingly, the 2003 FSEIS appropriately eliminated such an alternative from detailed study based on its similarity to the alternative of taking no action.[20]

## CONCLUSION

For the reasons described above, the undersigned finds that the 2004 BOs from FWS and NMFS were arbitrary and capricious under the APA, but that FS and BLM complied with NEPA in their 2003 FSEIS. Accordingly, the undersigned recommends that the parties' motions for summary judgment be GRANTED in part

**19.** As asserted by federal defendants, it does not appear that the Ninth Circuit has ever found a statement of purpose and need unreasonable. (*See* Dkt. 69 at 57.)

**20.** Plaintiffs argue in their reply that the 2003 FSEIS failed to provide a candid, objective assessment of the alternative embodying the original ACS and, instead, simply depicted this alternative as embodying a misinterpretation of the ACS which imposed project-level gridlock. As noted by federal defendants, the Court need not consider arguments first

raised in a reply. *See, e.g., Officers for Justice v. Civil Serv. Comm'n,* 979 F.2d 721, 725–26 (9th Cir.1992) (declining to address arguments raised for the first time in a reply brief). However, the undersigned nonetheless finds that the 2003 FSEIS appropriately disclosed the environmental effects of the No Action alternative as akin to those projected for Alternative 1 in the 1994 SEIS, and that that alternative would have fewer short term impacts than the action alternatives and may provide positive benefits. 2003 FSEIS 53–54.

and DENIED in part. A proposed order accompanies this Report and Recommendation.